985 So.2d 86 (2008)
Belinda FORBES, Individually and as the Natural Tutrix and Administratrix of the Estate of her Minor Child, Joshua Forbes
v.
Rodney COCKERHAM, State of Louisiana, Wayne Sonnier, Patterson Insurance Company, East Baton Rouge City-Parish Government and Dixie Electric Membership Corporation
George Forbes, Individually and as Parent and Administrator of his Minor Child, Joshua Forbes
v.
Wade Sonnier, Rodney Cockerham, State of Louisiana, Patterson Insurance Company, East Baton Rouge City Parish Government and Dixie Electric Membership Corporation
Nos. 2005 CA 1838, 2005 CA 1839.
Court of Appeal of Louisiana, First Circuit.
March 7, 2008.
*92 Gary B. Roth, R. Ray Orrill, Jr., Metairie, LA, for Plaintiff-1st Appellant Joshua Forbes.
Peter Brian Derouen, Lafayette, LA, for Intervenor-Appellee American Medical Security, Inc.
Charles C. Foti, Jr., Attorney General, Stacey Moak, Assistant Attorney General, Christopher A. Mason, Andrew W., Ralston, Baton Rouge, LA, for Defendant-Appellee State of Louisiana, through the *93 Department of Transportation and Development.
Robert E. Kerrigan, Jr., Isaac H. Ryan, New Orleans, LA, for 2nd Appellant Defendant-2nd Appellant National Union Fire Insurance Company of Pittsburgh, Pennsylvania.
Rodney Cockerham, Clinton, LA, In Proper Person Defendant-Appellee.
Before KUHN, GAIDRY, McCLENDON, HUGHES, and WELCH, JJ.
WELCH, J.
In this action for damages arising out of an automobile accident that occurred on Louisiana Highway 37 ("Greenwell Springs Road"), the plaintiff, Joshua Forbes, appeals a judgment of the trial court granting a judgment notwithstanding the verdict ("JNOV") in favor of the Louisiana Department of Transportation and Development ("DOTD") absolving DOTD from liability for the accident, and alternatively, granting a new trial on the issue of DOTD's liability. National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"), DOTD's excess liability insurer, has also appealed in the event the jury verdict is reinstated. Finding that the trial court erred in granting the JNOV and alternatively a new trial, we reverse the judgment of the trial court. We further find no error in the jury's verdict and, therefore, reinstate the judgment rendered on the jury verdict.

FACTUAL AND PROCEDURAL HISTORY
This case arises out of an accident that occurred at approximately 8:00 p.m. on Saturday, March 19, 1994, in East Baton Rouge Parish. The defendant, Rodney A. Cockerham, was driving his 1993 Geo Storm automobile southbound on Greenwell Springs Road after leaving the parking lot of Fleniken's grocery store, where he and a number of relatives and friends had congregated earlier. Accompanying him were his 16-year-old fiancee, Angela Marie Simonson; his cousin, Keith Cockerham; and his nine-year-old nephew, Joshua Forbes. None of the occupants had secured their seat belts.
The accident occurred approximately 1.8 miles from the store. The posted speed limit on Greenwell Springs Road was 45 miles per hour; however, Rodney was operating his automobile over the speed limit. Immediately before the accident occurred, his automobile had passed through a curve and was positioned near the centerline of the roadway. The vehicle then encountered a patched area or pothole in the roadway (located directly on the centerline of the highway and extending into the northbound lane) and according to the record, either the vehicle struck the patched area of the roadway or Rodney swerved to avoid it. As Rodney applied his brakes, his automobile skidded forward across the southbound lane, left the paved edge of the roadway, traveled onto the narrow southbound shoulder, and then to the steep adjacent shoulder slope. While on the shoulder slope, Rodney was unable to recover control of his vehicle, and the vehicle slid into the adjacent ditch. As the vehicle entered the ditch, it rolled over to its side and then struck a number of trees growing near the backslope of the ditch, within DOTD's right-of-way. The first tree struck was located approximately ten and a half to twelve feet from the adjacent edge of the roadway. The impact with the first tree tore open the automobile's passenger side, and Angela, the front seat passenger, was ejected from the automobile *94 and suffered fatal injuries.[1]
Additionally, Joshua was ejected from the automobile as the result of its collision with the tree, and he came to rest on the southbound lane of the roadway. Shortly thereafter, he was struck by a pickup truck operated by defendant Edgar Wade ("Wade") Sonnier, who had also been traveling south on Greenwell Springs Road just behind Rodney's automobile.[2]
As a result of the accident, Joshua suffered a multitude of catastrophic injuries, including the traumatic amputation of his left arm below the shoulder, multiple open fractures of the bones in both of his legs (which extended into his growth plates), multiple closed fractures in the bones of his right ankle, nerve damage in his right foot, and internal injuries to his stomach and pancreas. Joshua's injuries have required extensive medical treatment and numerous surgical procedures.
On March 20, 1995, Belinda Forbes, Joshua's mother, filed a petition seeking damages on his behalf in her alleged capacity as tutor and administrator, averring that she was awarded his custody in a divorce action initiated against Joshua's father. On that same date, George Forbes, Joshua's father, filed another petition for damages on Joshua's behalf.[3] These actions were later consolidated by order effective January 31, 1996.[4] Upon reaching the age of majority, Joshua was substituted as plaintiff for his individual claim for damages.
The trial of this case commenced on December 6, 2004, and concluded on December 16, 2004. At the conclusion of the trial, the jury returned a verdict finding Rodney 60% at fault and DOTD 40% at fault in causing Joshua's injuries and damages and absolving Wade of any fault. The jury awarded Joshua total damages in the amount of $12,650,234.00. On January 14, 2005, the trial court rendered and signed a judgment in accordance with the verdict of the jury. Thereafter, by judgment signed on April 27, 2005, the trial court granted a motion for JNOV filed by DOTD, amended the judgment on the jury's verdict to reflect a finding that DOTD was 0% at fault and a finding that Rodney was 100% at fault, granted a new trial in the alternative pursuant to La. C.C.P. art. 1811(C)(1), and affirmed all other parts of the January 14, 2005 judgment not affected by its ruling thereon (i.e., the provisions relating to the jury's award of damages and its determination that Wade was not at fault in causing Joshua's injuries and damages). Thus, the trial court's JNOV was limited to the issue of DOTD's liability. See La. C.C.P. art. 1811. It is from this judgment that Joshua now appeals.[5]
*95 National Union, who was neither named as a defendant in either consolidated action nor cast in judgment, has also perfected an appeal as authorized by La. C.C.P. art.2086 in the event this court reinstates the original judgment rendered on January 14, 2005, against DOTD.

ASSIGNMENTS OF ERROR
On appeal, Joshua contends that the trial court erred in granting JNOV on the issue of DOTD's liability and in granting a new trial in the alternative. He requests that this court reverse the April 27, 2005 judgment of the trial court and reinstate the jury's verdict.
National Union contends, in its appeal, that: (1) the trial court erred in allowing the plaintiff's expert, Mr. Clary, to testify as an expert in highway maintenance; (2) the trial court erred in instructing the jury regarding the "sudden emergency doctrine," (3) the jury erred in assigning only 60% fault to Rodney; and (4) the jury erred in awarding Joshua excessive general damages.[6]

EVIDENTIARY RULING

Opinion Testimony of Expert Witness James R. Clary, Sr.
In its first assignment of error, National Union contends that the trial court erred in allowing Mr. Clary to testify as an expert witness regarding highway maintenance. National Union reasons that Mr. Clary did not have specific training or experience in highway maintenance, and therefore, he should not have been qualified as an expert in highway maintenance. National Union asserts that his opinion testimony concerning DOTD's maintenance of Greenwell Springs Road (or lack thereof) should be excluded.
The admissibility of opinion testimony by an expert witness is governed by La. C.E. art. 702, which provides:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The admission of evidenceexpert or otherwiseis subject to the trial court's discretion. Wingfield v. State, ex rel. Dept. of Transp. and Development, 2001-2668, pp. 9-10 (La.App. 1st Cir. 11/8/02), 835 So.2d 785, 796 writs denied, XXXX-XXXX, XXXX-XXXX, and XXXX-XXXX (La. 5/30/03), 845 So.2d 1059 and 845 So.2d 1060, cert. denied, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282. Moreover, the trial court has great discretion in determining the qualifications of experts. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, p. 12 (La.App. 1st Cir.3/11/94), 634 So.2d 466, 477, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. Absent a clear abuse of the trial court's discretion in accepting a witness as an expert, appellate courts will not reject the testimony of an expert or find reversible error. Id.
After an examination of Mr. Clary on his qualifications as an expert, he was tendered *96 as an expert in the field of civil engineering, highway design, highway safety, and highway maintenance. DOTD objected to Mr. Clary's testimony as an expert in the field of highway maintenance.[7] However, the trial court determined that Mr. Clary did have "sufficient background and expertise to qualify as a civil engineer with expertise in highway design, highway safety, and in maintenance" and therefore, accepted Mr. Clary as an expert in such matters.
According to the record, Mr. Clary graduated from Louisiana State University in 1956 with a degree in civil engineering and has practiced civil engineering in Louisiana since that time. Mr. Clary testified that after graduation, he worked for the Louisiana Department of Highways (the predecessor agency of DOTD) in the bridge design section for approximately one year. After leaving the Louisiana Department of Highways, he worked as a civil engineer in the private sector as a consultant in the area of the design of roads, railroads, docks, sewerage, and drains, until he retired in 2000.[8] Mr. Clary testified that during his forty-four year career in civil engineering, he surveyed roads, designed roads, inspected roads, administered contracts of roads for parishes and private individuals, such as subdivision roads, and supervised the maintenance of private roads. Mr. Clary further testified that he has been a consultant for DOTD projects, and has prepared and participated in drafting plans and specifications for various DOTD projects, including roadway projects. Mr. Clary explained that because of his involvement with DOTD projects, he was familiar with the roadway design standards applicable to DOTD and civil engineers. And because he followed DOTD's standards for maintenance in overseeing maintenance on private roads, he was also familiar with DOTD's maintenance standards. Mr. Clary stated he has testified in court as an expert in the area of civil engineering, highway design, highway safety, and highway maintenance in numerous cases, and he believed his qualifications and familiarity with DOTD's design and maintenance standards qualified him to offer an opinion on highway design and maintenance in this case.
Based on Mr. Clary's testimony, we find that his education, training, knowledge, skill, and expertise qualified him to testify as an expert in the field for which he was tendered; namely, civil engineering with expertise in highway design, highway safety, and highway maintenance. Therefore, we cannot say that the trial court abused its discretion in accepting Mr. Clary as an expert in the field of highway maintenance.
This assignment of error is without merit.

LIABILITY OF DOTD

Standard of Review for JNOV
Louisiana Code of Civil Procedure article 1811 provides the procedural guidelines and authority for JNOV. This article provides that a JNOV may be granted on the issue of liability or on the issue of damages or on both issues. The standard to be used in determining whether a JNOV *97 may properly be granted has been set forth in our jurisprudence as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. (Citations omitted.)
Davis v. Wal-Mart Stores, Inc., XXXX-XXXX, p. 4 (La. 11/28/00), 774 So.2d 84, 89. The strict criteria for granting JNOV is predicated on the rule that when there is a jury, the jury is the trier of fact. Smith v. State, Dept. of Transp. & Development, XXXX-XXXX, XXXX-XXXX, pp. 12-13 (La.3/11/05), 899 So.2d 516, 525.
When reviewing a trial court's grant of a JNOV, an appellate court must employ the same criteria used by the trial court in deciding whether to grant the motion; in other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. Smith, XXXX-XXXX at p. 13, 899 So.2d at 525. If the answer is in the affirmative, then the appellate court must affirm the JNOV. Id. However, if the appellate court determines that reasonable minds could differ on that finding, then the district court erred in granting the JNOV, and the jury verdict should be reinstated. Id. Stated another way, neither the trial court nor this court may substitute its evaluation of the evidence for that of the jury unless the jury's conclusions totally offend reasonable inferences from the evidence. Templet v. State ex rel. Dep't of Transp. and Dev., 2000-2162, p. 6 (La.App. 1st Cir.11/9/01), 818 So.2d 54, 58.

Legal Precepts and Discussion of the Record
Joshua's petition for damages was premised on his right to recover from DOTD on the legal theories of negligence and strict liability. To prove negligence under La. C.C. art. 2315, Joshua was required to prove that: (1) DOTD had custody of the thing that caused his damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time; and (4) the defect was a cause-in-fact of his injuries. Netecke v. State, ex rel. DOTD, 98-1182, p. 7 (La.10/19/99), 747 So.2d 489, 494; Brown v. Louisiana Indemnity Company, 97-1344, p. 3 (La.3/4/98), 707 So.2d 1240, 1242. To prove strict liability under La. C.C. art. 2317, the burden of proof was the same except that Joshua was relieved of proving that the owner or custodian of the thing which caused the damage knew or should have known of the risk involved. Campbell v. Louisiana Dept. of Transp. & Development, 94-1052, p. 5 (La.1/17/95), 648 So.2d 898, 901.[9]
*98 In this case, there is no dispute that DOTD has custody and ownership of Greenwell Springs Road. DOTD has classified Greenwell Springs Road as a rural major collector highway (previously classified as a Class B highway), and it was originally brought within the state highway system in 1926. Prior to the date of the accident, Greenwell Springs Road underwent three relevant construction projects in area of the accident.
Project 490-8 (the 1929 project) was work-ordered in 1927 and accepted upon completion in 1929.[10] That project, which included the incorporation of the roadway into the state highway system, involved widening the roadway to provide one fourteen-foot travel lane, two five-foot shoulders, and the placement of a gravel surface on the original one-lane dirt road.
Project XXX-XX-XX (the 1951 project) involved widening the roadway to provide for two ten-foot travel lanes, the placement of seven additional inches of gravel and a paved asphalt surface over 10.3 miles of the existing gravel road, including the accident location, and provided for the construction of a 3:1 shoulder slope (a one-unit vertical drop for three units of horizontal distance). The project was assigned in 1949, work-ordered in July 1950, and accepted upon completion in June 1951.
Project XXX-XX-XX (the 1975 project) was assigned in July 1973, work-ordered in June 1975, and accepted upon completion in October 1975. It involved reworking, removing, and pulverizing the existing asphalt concrete roadway base and surface, stabilizing the old base and surface with cement to form a new, stabilized base, and overlaying the new stabilized base with a new roadway surface, with two eleven-foot travel lanes. The project work extended over a total distance of 4.55 miles, including the accident location.
In this case, the evidence upon which the trial court based its JNOV absolving DOTD from liability was described in its written reasons as follows:
This [c]ourt has thoroughly reviewed all testimony and evidence pursuant to this long trial that seemingly covered very technical and confusing matters. There can be no doubt that Rodney Cockerham was impaired by alcohol, was very familiar with the roadway but was still driving excessively over the speed limit, and was showing off moments before the accident. On those three points, there is no legitimate evidence that would have caused reasonable jurors to come to any other conclusion of fact.
Likewise, the plaintiff failed to prove, with either legitimate or substantial evidence, that DOTD did, in fact, have a right of way at the fence line and tree line in the area of the accident. Instead, DOTD introduced strong evidence in favor of a negative point  that the State *99 of Louisiana did not, in fact, own a right of way at the fence line and tree line in that area. Nonetheless, it was not DOTD's burden to prove that negative. Rather, it was plaintiff's burden to prove the positive fact that DOTD did own a right of way. Plaintiff failed to do so and reasonable jurors could not come to any other conclusion of fact. Furthermore, plaintiff did not prove that DOTD had a duty to cut down trees and fences that were not in their right of way and that they did not own.
Furthermore, this [c]ourt has not reviewed any legitimate or substantial evidence that proved Rodney Cockerham would have successfully traversed the shoulder had the slope had a 3 to 1 ratio. Rather, the only legitimate evidence presented was evidence that showed that Rodney Cockerham had lost control of his vehicle before he entered the shoulder slope. A reasonable juror could not have come to any other conclusion of fact.
. . . .
Consequently, this [c]ourt finds that Rodney Cockerham should be borne [sic] with 100% of fault in this accident. DOTD . . . should not share in this responsibility.
Thus, the trial court determined that JNOV absolving DOTD from liability was warranted: (1) because of the conduct of Rodney; (2) because the plaintiff failed to prove that the tree struck by Rodney's vehicle was located within DOTD's right-of-way; and (3) because Rodney lost control of his vehicle before it entered the shoulder slope, the steep shoulder slope was not a cause of the accident.
The plaintiff contends that JNOV was improper because there was substantial and legitimate evidence upon which reasonable, fair-minded jurors could have concluded that Greenwell Springs Road at the site of the accident had a defect which created an unreasonable risk of harm and that the defect that created the unreasonable risk of harm was a cause of the accident involving Joshua. Further, the plaintiff contends that the evidence in the record clearly and overwhelmingly supports the jury's verdict.
Specifically, the plaintiff submits that the evidence demonstrated that Greenwell Springs Road had a defect which created an unreasonable risk of harm because: (1) the roadway, as constructed in the 1951 project contained safety features, such as a 3:1 shoulder slope and a clear right-of way (or recovery zone) that deteriorated and were lost solely as a result of DOTD's failure to properly maintain the road; (2) DOTD failed to perform routine maintenance of the road and its right-of-way, which would have provided a clear recovery zone for Rodney's vehicle; and/or (3) the reconstruction of the highway during the 1975 project failed to comply with applicable design standards set forth by AASHTO, and as a result, the roadway, shoulders, and recovery zone were deficient. The plaintiff further submits that DOTD's failure to maintain, construct, or design Greenwell Springs Road and its right-of-way was a cause-in-fact of the accident because the evidence demonstrated that at the time of the accident, had the shoulder slope been at least 3:1 and the right-of-way been properly maintained to provide an adequate clear recovery zone, the accident could have been avoided, or at least the extent of Joshua's injuries from the accident would not have been as severe.
Generally, DOTD's liability to the public for the condition of its state highways "depends on all the facts and circumstances determined on a case by case basis." Netecke v. State ex rel. DOTD, 98-1182, 98-1197, pp. 8-9 (La.10/19/99), *100 747 So.2d 489, 495. DOTD's responsibility with respect to highway design, construction, and maintenance is set forth in La. R.S. 48:35, and provides, in pertinent part:
A. The Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials [("AASHTO")]. Hereafter, the state highway system shall conform to such safety standards . . . . .
B. The chief engineer may designate highways within the state highway system for reconstruction or repair at standards which are less than those as approved by [AASHTO]; however, no reconstruction or repair shall be done on any highway under this Part which results in a pavement width of less than eighteen feet, and all reconstruction or repair done under this Part shall be accomplished within the existing right-of-way.
DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Toston v. Pardon, XXXX-XXXX, p. 10 (La.4/23/04), 874 So.2d 791, 799. DOTD must also maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Netecke, 98-1182 at p. 8, 747 So.2d at 495. DOTD does not have a duty to bring old highways up to modern AASHTO standards unless a new construction or a major reconstruction of the highway has taken place. Id. Nevertheless, DOTD does have a duty to correct unreasonably dangerous conditions existing on old highways. Id. And, while the failure to adhere to AASHTO standards may not itself attach liability, whether DOTD has conformed to those standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous. Aucoin v. State, through Dept. of Transp. and Development, 97-1967, 97-1938, p. 7 (La.4/24/98), 712 So.2d 62, 66 and Dill v. State, DOTD, 545 So.2d 994, 996 (La.1989). Thus, in determining whether a highway poses an unreasonable risk of harm (or is defective for strict liability purposes), the trier of fact may consider not only the standards in effect at the time of construction, but also, those in effect at the time of the accident.[11]
DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself on, or partially on, the shoulder. Graves v. Page, 96-2201, pp. 12-13 (La.11/7/97), 703 So.2d 566, 572. This duty to maintain highway shoulders in a reasonably safe condition, however, does not render DOTD the guarantor of the safety of all the motoring public. Lasyone v. Kansas City Southern R.R., 2000-2628, p. 8 (La.4/3/01), 786 So.2d 682, 690. Our jurisprudence has recognized DOTD's duty in that regard to prudent and attentive drivers, and also to drivers who are "slightly exceeding the speed limit *101 or momentarily inattentive." Id. at 694-695; Cormier v. Comeaux, 98-2378, p. 6 (La.7/7/99), 748 So.2d 1123, 1127.
Additionally, our supreme court has held that a finding of intoxication alone does not preclude a finding of fault on the part of DOTD for failure to maintain or upgrade a highway shoulder or slope. Petre v. State, ex rel. Dept. of Transp. and Development, XXXX-XXXX, p. 12 (La.4/3/02), 817 So.2d 1107, 1114. Rather, a driver's "unacceptable and illegal actions in driving while intoxicated" should simply be "weighed heavily against [him] in considering the extent of DOTD's duty to [him]," being "merely a factor to consider in Louisiana's comparative negligence scheme." Id.

A Defect that Created an Unreasonable Risk of Harm

DOTD's Failure to Maintain the Shoulder
The plaintiff's expert, Mr. Clary, testified that DOTD had a duty to maintain its roadways as built. Gordon E. Nelson, Sr., the Assistant Secretary of Operations for DOTD at the time of trial and a former district maintenance engineer for DOTD whose district included Greenwell Springs Road in 1994, acknowledged that DOTD is responsible for maintaining roads in the condition that they were built, regardless of whether the road has been reconstructed or overlaid. Additionally, Richard L. Savoie, an assistant road design engineer for DOTD, testified that DOTD had a duty or obligation to repair and preserve existing highways in order to maintain them at or near their original level of standard usefulness.
Mr. Clary testified that he went to the accident site and reviewed the construction history of the roadway. Comparing the actual physical characteristics of the roadway and shoulder to the 1951 project's as-built plans, Mr. Clary concluded that there were material deviations from the as-built plans which he opined presented an unreasonable risk of harm to the motoring public.
Mr. Clary testified that the 1951 project's as-built plans confirmed that the roadway was built as shown on those plans. Although Mr. Clary admitted that he had no documentation, such as an earlier survey, relating to the precise angle or slope of the shoulders along Greenwell Springs Road as of 1951 when the 1951 project was accepted, he testified that he based his conclusion on the fact that the features shown on the as-built plans were all checked off, confirming that the features were inspected after they were built. Safety features added in 1951 included an asphalt overlay and a 3:1 shoulder slope. The as-built plans showed a shoulder width of one-foot, with the adjacent shoulder slope of 3:1. According to Mr. Clary, a 3:1 shoulder slope is traversable by a motor vehicle, but not "recoverable" in terms of the vehicle being able to re-enter the travel portion of the roadway from the slope.
Based on Mr. Clary's inspection of the accident site in July 1994, he prepared a survey of the accident site as it existed on March 19, 1994. Mr. Clary observed that the shoulder as originally finished (assuming it was uniform in 1951) had eroded and some of the shoulder base had washed away. Additionally, Mr. Clary noted that the shoulder slope was considerably steeper than 3:1. At the accident location and immediately prior to the vehicle's point of rest, the shoulder's slope was 1.87:1 and 1.33:1, respectively. At the vehicle's point of rest, the shoulder slope was 1.62:1. Mr. Clary opined those findings reflected a lack of maintenance by DOTD.
*102 DOTD's Maintenance Planning Manual sets forth DOTD's obligations to conduct inspections to determine necessary maintenance and provides that its objective is "to protect the state's investment in transportation facilities, and provide an acceptable level of comfort and convenience to the traveling public." The manual describes the different maintenance tasks in terms of "functions."
The shoulders along Greenwell Springs Road in the area of the accident are unpaved. Function 443 of the Maintenance Planning Manual addresses the maintenance and restoration of non-paved shoulders and provides that the shoulders should be restored to their "original grade and cross slope." According to Mr. Clary, in this case, that function would include restoring a 3:1 slope to the shoulder slope as constructed in the 1951 project if that slope became too steep.
Mr. Clary stated that such shoulder maintenance should be characterized by DOTD as "routine" (as opposed to "extraordinary" or "serious"). Furthermore, DOTD witnesses acknowledged that DOTD provided each operating district with sufficient funds to cover the cost of materials and manpower to perform routine maintenance and required that such maintenance be performed annually.
Mr. Nelson confirmed that DOTD's 1991 Maintenance Manual was adopted after La. R.S. 48:35 required DOTD to adopt safety standards conforming, "so far as possible," to those of the American Association of State Highway and Transportation Officials (AASHTO). He claimed that DOTD did incorporate some of AASHTO's safety standards, "as far as [it was] practical." He admitted that DOTD is required to maintain its roads and shoulder slopes as built within the "clear zone" applicable at the time the highway was constructed. He also admitted that the restoration of highway shoulders, in accordance with Function 443, was one of the required tasks of DOTD's Maintenance Planning Manual. Although Mr. Nelson opined that Function 443 pertained to "edge drop-offs from the roadway to the shoulder of three inches or more" he acknowledged that it also expressly applied to the situation where "[g]rading over a period of years without adding additional material causes the outside edge of the shoulder to become too low."
Mr. Nelson also explained that for the maintenance of Greenwell Springs Road and similar highways, DOTD could not use a tractor to clear the ditch and backslope, but instead had to use a slope mower, consisting of a tractor with a "bush hog" mounted on an arm. Mr. Nelson admitted that DOTD's maintenance of the shoulder at issue was limited to mowing it and filling in washouts of material. He also admitted that DOTD never restored the shoulder slope to bring it to a 3:1 slope, despite the 1951 project's plans (and as-built plans) designating the highway's shoulder slope as 3:1.
James A. White, a former construction inspector and currently a maintenance supervisor, testified that as to the restoration of a deteriorated shoulder, DOTD would generally restore the shoulder to its existing slope rather than to its original slope, although he conceded that Function 443 involved restoring unpaved shoulders from the outer edge of the shoulder to its original position. Mr. White opined that the shoulder at issue was properly maintained because there was no drop-off, the grass was mowed, and a fogline was present.
Edward R. Wedge, III, a design engineer in DOTD's road design section, opined that a 3:1 shoulder slope was "traversable," meaning that an automobile can travel on it. Referring to the 1951 project's as-built plans, Mr. Wedge testified *103 that if a check mark was placed next to a work item shown on such plans, it meant that the project engineer confirmed the work item's conformity to the as-built plans through a field inspection. Since the work item showing a 3:1 shoulder slope on the "typical embankment section" plan was checked off, that tended to indicate that a 3:1 shoulder slope was in fact constructed. However, later during the trial, Mr. Wedge clarified his earlier testimony regarding the 1951 project's as-built plans by observing that on the "finished section" plan, contained on the same sheet as the "typical embankment section" plan, the notation "varies" appeared under that for a "3:1" slope. Given that circumstance, he opined that the as-built plans did not confirm that the completed shoulder slope actually had a 3:1 slope, as opposed to a varying slope. However, he was unable to answer how much variance DOTD permitted from its project plans.
Based on the lack of maintenance, Mr. Clary opined that at the time of the accident, Greenwell Springs Road was deficient in terms of shoulder width and shoulder slope, with both the shoulder and the shoulder slope being much steeper than they were designed to be. He further opined that the steep and narrow shoulder and shoulder slope was an unreasonably dangerous condition and that the danger presented by that condition was that "a motorist who leaves the roadway [would] not be able to regain control" of the vehicle because when a shoulder slope becomes steeper than 3:1, the vehicle is very likely to overturn and the motorist thus becomes trapped in "a non-recoverable situation."

DOTD's Failure to Maintain the Right-of-Way
Aside from DOTD's failure to properly maintain the shoulders and shoulder slope on Greenwell Springs Road, there was also evidence indicating that DOTD failed to conduct routine maintenance on its right-of-way. Mr. Clary testified that DOTD also has a duty to keep the right-of-ways along its highways clear of obstructions, such as trees.
According to the evidence, when Greenwell Springs Road was originally incorporated into the state highway system, the roadway included a right-of-way that extended thirty feet on both sides of the road's centerline or to the nearest fence, which ever was closer. The 1929 project plans included an overview of the right-of-way on the "Schilling Tract" (where the accident occurred), and although the Schilling Tract had a fence, the relevant portions of the fence, as it existed at the time, were outside the thirty-foot right-of-way established on the plans. In other words, as early as 1927 (when the 1929 project was work-ordered), DOTD's right-of-way extended thirty feet from the centerline of the roadway and was unencumbered by any fence line in the area of the collision.
Additionally, Mr. Clary testified that according to the 1951 project's as-built plans, DOTD's original right-of-way extended for thirty feet on both sides of the highway measured from the centerline of the roadway or up to any fences, whichever was closer. As part of the project work, "clearing" and "grubbing" work was performed on 18.7 acres as necessary within that right-of-way. Mr. Clary noted that his review of the 1951 project documents showed that there were no fences within that right-of-way on either side of the accident location.
According to Mr. Clary's survey, the tree that Rodney's automobile struck was located 10.4 feet from the edge of the roadway pavement, very close to an existing fence, which was 11.9 feet from the edge of the roadway.
*104 Eric Randall Lanier, a registered land surveyor employed by DOTD and accepted by the trial court as an expert witness in the field of land surveying, testified that he inspected the accident site, took precise measurements, and prepared a survey map or plat (which was dated July 12, 1996 and introduced into evidence at trial).
Mr. Lanier testified that in performing the survey of the accident location, he located a fence line on the Schilling property to the west of the southbound lane of Greenwell Springs Road, roughly following a tree line which was within the thirty-foot right-of-way established in the 1929 project plans. Mr. Lanier estimated that the existing fence was twenty to thirty years old. Thus, the existing fence was built closer to the road than the fence depicted in the 1929 project plans.
Mr. Lanier testified that he was also able to identify the fence line that "meandered" along Greenwell Springs Road. At one location north of the tree impact location, the fence was 22.9 feet from the centerline of the roadway. At its southern end, past the tree impact location, the fence was situated 24.05 feet from the centerline. The tree impact location was 22.72 feet from the centerline. Since the roadway edge was eleven feet from the centerline, the tree impact location was 11.72 feet from the roadway edge. Thus, Mr. Lanier confirmed that the tree impact location was closer to the roadway than the fence at that point.[12]
Mr. Lanier's findings in this regard were confirmed by Mr. Clary's survey, noted above, wherein it was determined that the new fence was 11.9 feet from the roadway and that the tree was 10.4 feet from the roadway. Thus, while the new fence line and the tree line encroached approximately eight feet onto the thirty-foot right-of-way existing in the 1929 project plans, the tree that Rodney's vehicle struck was still inside the new fence line found by Mr. Lanier. In other words, even if the new fence deprived DOTD of a portion of its previous right-of-way, the tree involved in this accident was still within the new right-of-way. Moreover, according to Mr. Clary, DOTD should not have even allowed a new fence to be built or exist within the thirty foot right-of-way from the centerline of the highway as noted in the 1929 and 1951 projects' plans and should have removed any such fence.
With regard to the maintenance of the right-of-way, Function 471 of the Maintenance Planning Manual provided for the manual cutting, clearing, and disposal of brush and trees from the right-of-way. Additionally, AASHTO guidelines recommended the removal of all trees larger than four inches in diameter within thirty feet from the abutting lane edge or within fifteen feet of a ditch backslope. The tree that Rodney's car struck was approximately ten inches in diameter and was approximately 10.4 to 11.72 feet from the roadway. Thus, the tree's presence in DOTD's right-of-way was a clear violation of DOTD's duty to properly maintain the right-of-way.
Mr. Nelson testified that he disagreed that the AASHTO maintenance standard requiring the removal of trees more than four inches in diameter and within thirty feet of a roadway edge applied to DOTD. Mr. Nelson explained that although there may be trees growing from the backslope of the highway ditches to the right-of-way, DOTD did not have the funds or the manpower to cut all such trees down along *105 narrow state highways, such as Greenwell Springs Road. However, Mr. Nelson admitted that if a fence was erected within an existing determined right-of-way, DOTD had a duty to remove the fence.
Mr. White testified that as part of maintenance, DOTD did not necessarily clear the entire right-of-way of trees, and did so only "[i]f we can get to the back of the right of way." However, Mr. White admitted that he was unaware of the AASHTO maintenance standard recommending the removal of trees over four inches in diameter from within thirty feet of a roadway edge.

DOTD's Failure to Properly Design or Construct Greenwell Springs Road
Lastly, the plaintiff contends that Greenwell Springs Road contained a defect which created an unreasonable risk of harm because DOTD failed to properly design and construct Greenwell Springs Road when it reconstructed the roadway in 1975. If the 1975 project was a major reconstruction, then DOTD was required to satisfy the then existing AASHTO design standards. See La. R.S. 48:35; Netecke, 98-1182 at p. 8, 747 So.2d at 495. The AASHTO design standards in 1975 for a Class B (or a rural major collector highway), such as Greenwell Springs Road, would have called for a minimum eight-foot shoulder and a minimum 4:1 shoulder slope.
DOTD Highway Plan Preparation Manual governs roadway design within DOTD. Appendix A to the Plan Preparation Manual, as it existed in 1974, defined DOTD's "General Construction Categories" and provides the following:
2. Reconstruction

Category A: Complete reconstruction along substantially the present alignment. May include minor revisions to the horizontal geometry and vertical alignment.

Category B Reconstruct Base and Surfacing: Existing base and surfacing to be reworked, stabilized or replaced. New surface to be constructed. Existing embankment and drainage to remain in place. No right-of-way required.

Category C Reconstruction and Surface: Same as Category A except that the existing road is not hard surfaced.
Mr. Clary testified that the 1975 project involved elements of construction that constituted a "reconstruction." Prior to the 1975 project, Greenwell Springs Road had a gravel base. As part of the 1975 project, that existing base was ground up, cement and water were added to it, the material was compacted, and three and half inches of asphalt laid over that. The existing surface was also replaced with a new aggregate surface course. The existing embankment and drainage remained in place and no new right-of-way was acquired. Thus, in Mr. Clary's opinion, the 1975 project met the manual's definition of a category 2(B) reconstruction, in that the existing surface was removed, ground up, and stabilized with cement. An overlay, under Mr. Clary's interpretation, would have involved simply placing a new surface over an existing surface.
Mr. Clary explained that the categories of "new construction" and "reconstruction" require the use of the then-current safety standards by DOTD. In 1975, the applicable safety standards would have been those published in 1973. He expressed the opinion that Greenwell Springs Road was a Class B roadway, with the average daily traffic class being Class 3 (3000 or less). According to the 1973 version of DOTD's Minimum Design Standards for Rural Highways from the Highway Plan Preparation Manual, a reconstruction of Greenwell Springs Road should have incorporated lanes of twelve feet, rather than eleven *106 feet, and shoulders eight feet in minimum width as compared to three and one-half feet. According to Mr. Clary, the shoulder's slope or foreslope should have been 3:1, based on the original 1951 project plans, although the safety standard at the time of the 1975 project required a minimum 4:1 shoulder slope.
According to the 1975 project plans, Mr. Clary noted that item No. 5, the "typical finished section" plan, stated "match existing slope." Mr. Clary interpreted the quoted instruction to refer to the originally designed slope, rather than the actual existing slope at the time of the project. However, Mr. Clary conceded, that for new construction or reconstruction of a highway to modern standards, the drawings and plans for such work would not have stated "match existing slope." Additionally, a typical new construction or reconstruction project would have required more detailed engineering sheets, which were not prepared for the 1975 project. Mr. Clary also conceded that if the 1975 project were considered an overlay rather than a reconstruction, then DOTD did not fail to do anything it should have done. He admitted that if his interpretation of the requirements for reconstruction were accepted, DOTD would have had to acquire a 150-foot right-of-way and construct lanes twelve feet wide (rather than eleven), with eight-foot minimum shoulders, for only 4.5 miles of roadway in the 1975 project. He further admitted that under that scenario, DOTD would actually have been obligated from a prudent engineering standpoint to undertake to reconstruct the entire highway past the project section in the same manner.
However, Mr. Clary maintained his opinion that every element of a category 2(B) reconstruction was satisfied by the 1975 project. Additionally, both Mr. Savoie and Mr. Wedge testified that the work performed on the 1975 project met DOTD Highway Plan Preparation Manual's definition of a category 2(B) reconstruction; however, they continued to maintain that the 1975 project was not considered a reconstruction by DOTD.
Mr. Savoie explained that the Highway Plan Preparation Manual is a "guide" for use by project designers in DOTD's road design section and by consultants doing design work for DOTD, providing standards for the format and content of sets of plans. He further explained that the "General Construction Categories" described therein were included to assist the project designer in understanding the various categories, but did not constitute design or construction standards.
Mr. Savoie agreed that if DOTD actually undertook a reconstruction of the highway in 1975, it would have been required to comply with the highway design standards in effect at that time. He admitted that if the 1975 project on Greenwell Springs Road amounted to a reconstruction of the highway, the roadway and shoulders at the accident location and on the accident date would not have met the 1973 design standards for the three criteria of lane width, shoulder width, and shoulder slope. He further admitted that if it was assumed that the 1975 project amounted to a reconstruction, the horizontal clearance standard applicable would have been 30 feet from the edge of the travel lane.
Mr. Savoie further testified that there is no confusion on DOTD's part as to the meaning of a reconstruction project, as compared to that of an overlay project. He explained that a reconstruction project typically takes four to five years to fully develop, involves federal funding, and requires a full topographic survey of the entire route. Mr. Savoie asserted that he had never encountered a rural highway reconstruction project that did not require *107 the acquisition of additional right-of-way, because the 1973 Design Standards for Reconstruction and New Construction required 150 feet in total width of right-of-way, much more than the right-of-way acquired when most rural highways were originally brought into the state highway system.
Mr. Savoie testified that an actual reconstruction of a two-lane highway costs approximately $1,500,000.00 per mile. According to Mr. Savoie, with 16,700 miles of roadway in the state highway system and an annual DOTD budget of about $500,000,000, it is physically and fiscally impossible for DOTD to undertake actual reconstructions on all highways needing some maintenance or repair. In the case of roadways having only a dirt base beneath an asphalt surface, DOTD may choose to reconstruct and stabilize the base and then add a new overlay. In that event, it is very common to churn up the existing or old base and add cement to stabilize it before placing a new asphalt overlay. That reconstruction of the base, or overlay work, would not constitute reconstruction of the highway. He claimed that the only engineer whom he had ever heard characterize that type of overlay as a reconstruction was Mr. Clary, the plaintiff's expert, and reiterated his earlier testimony that the Highway Plan Preparation Manual and its definitions do not regulate what constitutes an actual reconstruction of a highway.
Mr. Savoie reviewed the 1975 project's plans and identified the work described therein as an overlay or system preservation project. The plans described a roadway to be improved by in-place stabilization and overlay, with the aggregate shoulders being brought up to the elevation of the overlay. The plans did not mention any work by the contractor on the ditch foreslope. The total distance of work on that project was 4.55 miles, and the work was to take 60 days. The project cost was $519,977.04. Mr. Savoie estimated that an actual reconstruction project in the mid-1970s would have cost $500,000.00 to $600,000.00 per mile simply for the construction work, without factoring in the cost of acquiring additional right-of-way.
With regard to the 1975 project, Mr. Wedge disagreed that the project constituted a "reconstruction" in terms of highway design, although he agreed that the work met the definition of category 2(B) reconstruction in the Plan Preparation Manual. He admitted that the 1975 project did not meet the then-current design standards for new construction or "major reconstruction," such as twelve-foot lanes, shoulders often to twelve feet, or 4:1 to 6:1 shoulder slopes.
Mr. Wedge explained that he did not believe that the 1975 project met the criteria for an actual reconstruction of the highway because the vertical and horizontal geometry of the roadway was not upgraded, no topographic survey was prepared, and no additional right-of-way was purchased, as would be required in the case of new construction or reconstruction.[13] Additionally, an overlay project at the time of trial cost about $150,000.00 per mile, while new construction or reconstruction cost about $1,500,000.00 per mile. Based upon the 1975 project's estimated cost of $534,000.00 for 4.55 miles of work, as well as the other characteristics he described, *108 Mr. Wedge concluded that the 1975 project was an overlay project.
Mr. Nelson testified that the area of Greenwell Springs Road at issue had never been reconstructed, although it had been overlaid. He stated that before assuming his position as DOTD's assistant secretary of operations, he had served in the capacity of project engineer on overlay projects. As part of that job, he was familiar with plans for overlay projects. He identified the contract for the 1975 project as "a standard contract for an overlay project." He based his conclusion on the type of work described; the size of the plans (letter-size); the relative cost of the contract; and the absence of such items as the buying of right-of-way, redoing of drainage structures, and clearing and grubbing.

The Defect that Created the Unreasonable Risk of Harm Was a Cause-in-Fact of the Accident
With regard to the events leading up to the accident, Rodney testified that he recalled he, Angela, Keith, and Joshua leaving together in his vehicle approximately a half-hour after the store closed. He could not recall whether he drank any beer while at the store and could not recall any events which occurred after leaving the store, prior to waking up in the hospital after the accident. He testified that he was familiar with Greenwell Springs Road and had driven on it numerous times before the accident. Rodney also testified that he knew the speed limit on the road was 45 miles per hour. Rodney testified that when he drove on Greenwell Springs Road prior to the trip during which the accident occurred, he did not observe any problem with the roadway and had no recollection of trying to dodge a pothole on the accident date.
Sherry Dickerson of Walker, Louisiana, testified that she has been driving on Greenwell Springs Road since 1981. On March 19, 1994, between 7:30 and 8:00 p.m., she was traveling southbound on Greenwell Springs Road. As she passed Fleniken's grocery store, she recognized Rodney's automobile in the parking lot and saw her stepbrother, Keith Cockerham. After passing the store and traveling one to two miles, Sherry Dickerson testified that she observed, in her rearview mirror, a vehicle's headlights approaching from her rear. She estimated that the other vehicle was traveling somewhat faster than her vehicle, which was traveling at 55 miles per hour. At that time, the following vehicle did not appear to be out of control, and she did not observe anything unusual about its movement. However, as the other vehicle approached the location where the accident occurred, it appeared to be out of control. She could not specifically recall whether the headlights appeared to move up or down or from side to side, but claimed that she never lost sight of the headlights in her rear view mirror prior to the time that the other vehicle came to rest.
Keith testified that he was seated in the rear seat of Rodney's automobile as they left Fleniken's parking lot. A short time later, Rodney passed another vehicle while traveling at 90 to 100 miles per hour, a fact Keith verified by looking at the speedometer. He testified that he was "very upset" by the speed and, using a profanity, demanded that Rodney slow down. Keith testified that Rodney complied with his request because Rodney let up on the accelerator, and Keith heard the engine "wind down."
Keith testified that after the automobile began to decelerate, he felt "a little shift" or "sway," as if the vehicle had hit something in the roadway. He stated that the vehicle struck a "pothole" (although he admitted that he did not see the pothole) and headed straight into the ditch adjacent *109 to the southbound shoulder. He estimated the automobile's speed at the time it entered the ditch at 60 to 65 miles per hour. The automobile then struck a tree, and Keith was rendered unconscious. When Keith regained consciousness after the accident, he was the only occupant remaining in the automobile. He managed to crawl through a hole in the automobile's body and walk a short distance toward Wade's truck before falling and losing consciousness again.
Toby Scott testified that Wade's truck was the first vehicle to leave the parking lot. After the truck had traveled some distance, Toby heard Shane Blankenship say something, and then he observed the taillights of an automobile passing around a curve, although he did not actually see Rodney's automobile pass the truck. As the truck then rounded the curve, Toby testified that he observed vehicle debris and Joshua lying in the roadway. Once Wade realized there was a person in the roadway, he swerved, but the right or passenger's side of the truck struck or rolled over Joshua. Wade then stopped the truck, and as Toby encountered Keith, he asked what had happened. Keith advised him that, "We hit a pothole."
Joshua testified that the entire group remaining in the parking lot of Fleniken's grocery store decided to leave in two vehicles for the purpose of traveling to Toby's house for a barbecue. Joshua did not recall Rodney's automobile traveling 100 miles per hour, nor did he recall Keith demanding Rodney to slow down. He recalled the automobile going around the last curve before the accident location and passing over something that felt like a hole, which caused the automobile to "kind of jerk down." The automobile then veered off the roadway. The next thing he recalled was lying in the road, touching his chin with a hand, and noticing blood on that hand. A few seconds later, he looked up and saw headlights. His next memory was waking up in the hospital two months later.
Louisiana State Trooper Christopher Lanoux responded to the report of the accident on March 19, 1994, and arrived at the scene at approximately 8:45 or 8:50 p.m. Trooper Lanoux stated that he did not observe any potholes in the vicinity of the accident, although later that evening, in the course of his investigation, he observed a patched area of roadway north of the accident site. Trooper Lanoux testified that the speed limit for that area of Greenwell Springs Road was 45 miles per hour. He estimated that Rodney's vehicle was traveling at least 75 miles per hour (or more) immediately prior to the accident or at the point where the skid marks started. His speed estimate was based upon calculations utilizing as factors the length of the skid marks, the type of roadway surface, and the distance traveled by the automobile to the edge of the roadway.
Dr. Franklyn Griffith, an expert in physics and accident reconstruction, reviewed the Louisiana State Police photographs in arriving at his professional opinion and prepared a diagram of the accident location, showing his estimation of the automobile's path of travel to the point it left the roadway. He described a very shallow curve north of the area shown and described the first "hard" (objective) evidence relating to the accident as the beginning of a tire mark located fairly close to the highway centerline.
In Dr. Griffith's opinion, Rodney attempted an evasive maneuver of some type, perhaps after having seen the patched potholes on the roadway, and swerving to miss what he perceived to be a hazard. He concluded that the automobile left the roadway at a fairly shallow angle, although canted slightly counterclockwise, *110 toward the centerline, as it left the roadway. He testified that the tire marks observed by the investigating officer were probably a combination of braking marks and yaw marks caused by a sliding vehicle. He estimated the automobile's speed in the area of the patched pothole (at the first tire mark) at approximately 60 miles per hour. Based upon photographs of the automobile damage, Dr. Griffith estimated that the automobile's orientation or angle was 20 degrees off vertical (vertical being 90 degrees) at the time it struck the trees. Dr. Griffith attributed the vehicle's angle to the combination of the steep shoulder slope and the soft ditch bottom. He estimated the automobile's speed at the time it left the roadway to be 50 to 51 miles per hour and estimated its speed when it struck the two trees to be 47 miles per hour.
Dr. Griffith performed a comparison analysis of the automobile's expected movement, assuming that the roadway would have had different geometric design features. Assuming an automobile leaving the roadway at a seven degree angle at 50 miles per hour, with a flat grass shoulder six feet in width, and with its driver steering the vehicle back toward the roadway at three degrees, the automobile's center of mass would travel approximately four feet before it would turn and start back toward the centerline of the roadway. With a shoulder slope of approximately 20 degrees, which would be slightly steeper than a 3:1 slope, the automobile would be able to traverse the shoulder, but not to recover and get back onto the roadway. A 4:1 slope would allow an automobile to recover the roadway. With a 3:1 slope and a clear recovery zone of 30 feet, an automobile would travel to the base of the slope and would then either attempt to recover the roadway or to stop. Dr. Griffith admitted that based upon the physical evidence, he was not able to determine whether the driver, Rodney, had in fact attempted to steer back onto the roadway.
Dr. Griffith described the most significant "environmental" contributing factors to the damage sustained by automobile, in order, to be: (1) the tree line, (2) the shoulder slope, and (3) the presence of the "pothole" or pothole patch. He testified that he did not know whether the driver of the automobile constituted a contributing factor in the accident.
Dr. Griffith testified that if the roadway had a 3:1 shoulder slope and a narrow shoulder, or a 3:1 or 4:1 shoulder slope with wider shoulders, the collision would not have occurred, depending upon whether the driver steered after entering the slope.
Dr. Griffith admitted that the only factual basis upon which he formulated his opinion regarding the driver's supposed reaction to the "pothole" was the first tire mark located near the patched pothole. He confirmed that neither Rodney nor the passenger, Keith, reported such an occurrence in their depositions. Dr. Griffith stated that the radius of the fifth and last curve in the roadway between Fleniken's store and the accident site was rather gentle, and that its curvature did not play a part in causing the accident. He admitted that if the automobile's path were projected back using the path of the tire marks, the path would enter the northbound or opposite lane, but he disagreed that such necessarily indicated the true path of the automobile's movement prior to the location of the first tire mark. He did admit, however, to the possibility that the automobile entered the northbound lane as part of the process of its driver "straightening out" the last curve. He further admitted that in making assumptions about the driver's reaction time for purposes of his calculations for the alternate *111 hypothetical shoulder slope scenarios, he used a standard reference for a "normal" driver, rather than an intoxicated one.
Dr. Griffith's measurement of the distance of the first tree struck to the center of the painted fogline of the highway was 11.6 feet. He testified that if Rodney was steering and braking at the point where the first tire mark was made, he probably had control of his automobile. At the point where the automobile ran off the roadway, it could be characterized as being out of control. He admitted, however, that at the point where the first tire mark was made, the automobile was headed toward the edge of the roadway. At that point, the automobile speed did not exceed 65 miles per hour, with the median speed calculated at 60 miles per hour.
Ric D. Robinette, a mechanical automotive engineer and an expert in accident reconstruction, testified on behalf of DOTD that he reviewed various photographs, documents, and depositions; inspected the accident location; met with the investigating state trooper; and drove a similar (or "exemplar") automobile in the process of formulating his professional opinions.
Mr. Robinette concluded that the automobile's speed at the point of loss of control (the location of the first tire marks) was between 73 to 77 miles per hour.[14] The speed at the point it left the roadway was approximately 58 miles per hour. Mr. Robinette believed that the automobile struck three or possibly even four trees. After the main impact of its roof with the first tree, the automobile traveled about 43 feet, spinning approximately 180 degrees before coming to rest in a grassy yard area south of the trees.
Mr. Robinette emphasized that his analysis of the effect of the automobile's impact with the trees upon its speed was virtually identical to that of Dr. Griffith. However, he disagreed with Dr. Griffith as to the location of the first tire mark relative to the highway centerline. His review of the photographic evidence showed that the initial tire mark actually originated in the northbound lane, near its no-passing stripe, rather than in the southbound lane.
Analyzing the photographs depicting the tire marks using a photogrammetric technique, Mr. Robinette was able to plot the paths of the automobile's four tires. He expressed the opinion that when the first tire, a rear tire, left the western or southbound side of the roadway, the automobile had spun 30 to 35 degrees counterclockwise relative to the roadway. The angle at which the automobile left the roadway was about seven degrees, making its total rotation angle between 37 to 42 degrees relative to its path of travel. Mr. Robinette also concluded that the automobile was already out of control when it left the first tire marks on the roadway, and that the initial loss of control would have occurred further north of the first tire mark and while some portion of the automobile was in the northbound or opposite lane of travel.[15]
Mr. Robinette explained that Joshua was probably ejected from the automobile's rear seat after the right side of its roof struck the first tree and was torn away, and as the automobile rapidly rotated *112 in a clockwise direction toward its final point of rest. He also expressed his opinion that the automobile would probably have struck the trees or other nearby trees, even if the shoulder slope was 3:1 or even completely flat.[16] On the other hand, if the automobile's speed had been 45 miles per hour (the speed limit) at the location of the first tire mark, the automobile could have skidded to a stop within 98 to 103 feet, or at a point near that where it actually left the roadway, and before reaching the tree line.
Mr. Robinette considered the most significant factors contributing to the accident and its effects upon Joshua to be: (1) vehicle speed, (2) loss of vehicle control, and (3) the occupant's failure to use seatbelt. With regard to the role of the patched area of the roadway, Mr. Robinette stated that although the pothole patch might have created a "rough ride," it would not have affected the automobile's direction of travel.[17] Mr. Robinette expressed his "strong" disagreement with Dr. Griffith's opinion that the patched area of roadway contributed in any way to the driver's loss of control, even as only a visual stimulus provoking a response by the driver. He reiterated his opinion that the initial loss of control occurred at a point prior to the automobile reaching the patched area and also opined that the initial loss of control occurred before the driver would have had adequate time to perceive and react to the patched area at night.
However, Mr. Robinette admitted that he could not express an opinion as to what caused the initial loss of control of the automobile. He further admitted that a sliding automobile will frequently leave physical evidence, in the form of yaw marks, prior to its reaching 37 to 42 degrees of rotation. Mr. Robinette also acknowledged that tire marks left by a rotating vehicle will typically cross each other rather than parallel each other in straight lines, and that such marks will curve if visible over the vehicle's entire rotation path.[18]
Additionally, Mr. Robinette admitted that his opinion at trial regarding the speed of the automobile had changed since his pretrial deposition, but explained that he did not have the benefit of the daytime photographs depicting the tire marks earlier. He agreed that in a hypothetical situation with a sliding vehicle traveling straight forward, leaving the roadway at a seven-degree angle, and the driver attempting maximum steering to recover the roadway, the driver should be able to recover the roadway with a flat shoulder slightly over eight feet in width. Finally, Mr. Robinette admitted that the presence of the first tree struck was definitely a *113 significant factor contributing to Joshua's injuries. He conceded that with the vehicle speed he estimated, if the first tree struck had been located 30 feet or more from the roadway edge, then Joshua would likely not have been ejected onto the roadway following that impact.

Rodney's Intoxication
Rodney testified that he worked the night shift the day prior to the accident and got off work at approximately 3:30 a.m. After waking up that morning, he ate breakfast and performed mechanical work on a "four-wheeler" or all-terrain vehicle. Joshua was at his home at that time, as he had agreed to care for Joshua at Belinda Forbes's request the previous day. Rodney admitted that sometime prior to 3:00 or 4:00 p.m., he consumed two beers, but did not recall drinking any other alcoholic beverages after that time. Later that afternoon, he, Joshua, and Angela traveled to the home of Thomas Forbes, another of Joshua's uncles. After arriving, Rodney left about twenty minutes later to travel to Fleniken's grocery store to purchase soft drinks and candy bars for Angela and Joshua. He estimated that he arrived there at approximately 6:30 p.m. There, Rodney encountered his cousin, Keith, and a number of other individuals, including Wade, drinking beer from an ice chest in the back of a pickup truck. Thereafter, the store closed at 7:00 p.m.
At some point after Rodney arrived at the store, Angela and Joshua arrived in another vehicle driven by Monica Brown. He recalled that he, Angela, Keith, and Joshua left together in his vehicle approximately a half-hour after the store closed. He could not recall whether he drank any beer while at the store, and could not recall any events which occurred after leaving the store, prior to waking up in a hospital.
Keith testified that on the day of the accident, he had been cutting grass at his home, and in the course of that activity, over about an hour, consumed about six beers. His girlfriend drove him to Fleniken's grocery store so that he could get another beer and later attend a barbecue with friends. He arrived at Fleniken's shortly before 7:00 p.m. and managed to purchase one or two beers before the store closed. Also present in the parking lot at that time were Wade, Toby, Shane, Rodney, Angela, and Joshua. Keith testified that he remained in the store parking lot for 30 to 45 minutes before leaving in Rodney's automobile. During that interval, he did not observe Rodney drinking any beer or other alcoholic beverage. With regard to his own consumption of beer, Keith did not believe that he was intoxicated at that time, although he admitted that he had consumed a sufficient amount to have some alcohol in his blood.
Toby testified that he was acquainted with all the individuals present at the store immediately prior to the accident, and that shortly after he arrived at the store's parking lot, at about 5:30 or 6:00 p.m., Rodney and his passengers arrived. He specifically remembered Rodney with a beer in his hand immediately prior to leaving Fleniken's. At about 8:00 p.m., Toby entered Wade's truck to travel to his house for a barbecue. Toby testified that Rodney did not appear to be drunk when he entered his automobile to leave.
Although at trial, Toby testified that he did not observe Rodney's automobile as it passed, Toby admitted that he had previously testified by deposition that Wade's truck was traveling 65 miles per hour when Rodney's automobile passed them on the highway and that he estimated Rodney's automobile's speed to be 90 to 95 miles per hour.
*114 Joshua testified that Rodney drove to Fleniken's grocery store to purchase a candy bar for Angela. Monica Brown drove him and Angela to Fleniken's in order to find out why Rodney had not returned. They arrived at Fleniken's after it had closed for the day, and Monica Brown left after dropping him and Angela off. Joshua testified that Rodney was present in the parking lot with a group of men standing near the back of a pickup truck drinking beer. Joshua recalled that there were about four six-packs of Budweiser beer in the back of the truck, which was owned by Wade, one of the men. Also present in the group of men were Keith, Toby, and Shane. Joshua recalled that Toby and Wade were drinking beer and appeared to be intoxicated, and that Keith was drinking "heavily," "slurring, stumbling around, couldn't really talk or do much of anything," and appeared to be intoxicated. A bottle of what appeared to be whiskey was also being passed around. Joshua could not recall whether Rodney and Shane were drinking.
Trooper Lanoux testified that he noted a "moderate" smell of alcohol when he observed Rodney briefly at the scene of the accident and later at Our Lady of the Lake hospital. He also noted at the hospital that Rodney's speech was slurred. Therefore, he requested that blood samples be obtained from Rodney at the hospital for investigation of Rodney's blood alcohol content.
Thomas Wistrand, a paramedic employed by Baton Rouge EMS at the time of accident, testified that he and a co-worker received a call concerning an accident on Greenwell Springs Road that occurred shortly after 8:00 p.m. Upon their arrival, he initially administered medical aid to Rodney. He did not recall smelling alcohol on Rodney's breath, and stated that he would have recorded that observation if he had. He described Rodney as being alert and oriented at the scene, although he admitted that he was not able to carry on an extensive conversation with Rodney because of Joshua's critical condition.
Gary H. Wimbish, Ph.D. was accepted by the trial court as an expert witness in forensic toxicology. He was retained by DOTD to interpret and offer opinions regarding the blood alcohol testing of Rodney and its results. The Louisiana State Police crime laboratory report indicated a blood alcohol content of .06 grams percent. According to the records of Our Lady of the Lake hospital, this blood sample was drawn at 12:10 a.m. The reported time of the accident was 8:00 p.m. There was no evidence that Rodney consumed any alcoholic beverages or ate food after 8:00 p.m. Thus, the available firsthand information as to the actual number of alcoholic beverages consumed by Rodney was rather sparse. However, blood was drawn at 9:50 p.m. for purposes of serum blood alcohol testing. That testing yielded a result of 130 milligrams per deciliter, the equivalent of .13 grams percent. Dr. Wimbish explained that serum blood alcohol concentration is 1.18 times that of the corresponding whole blood alcohol concentration. Thus, the corresponding value of Rodney's whole blood alcohol concentration at 9:50 p.m. would have been .11 grams percent. Assuming that the blood alcohol concentration had peaked prior to the drawing of the hospital serum blood alcohol specimen and considering the rate of metabolism for an average male of Rodney's age, height, weight, and drinking habits, Dr. Wimbish extrapolated Rodney's blood alcohol concentration at 8:00 p.m. to have been .12 grams percent. At that blood alcohol concentration, Dr. Wimbish opined that a motor vehicle driver's reaction time, steering ability, and peripheral vision are decreased. Additionally, as *115 a central nervous system depressant, alcohol causes decreased inhibitions and increased risk-taking behavior.
Dr. Wimbish testified that in order to reach the blood alcohol level of .12 grams per cent at 8:00 p.m., Rodney would have had to consume the equivalent of twelve beers from approximately noon or 12:30 p.m. through the time of the accident. In order to achieve the same blood alcohol level based upon a rapid consumption of beer immediately prior to the accident, Rodney would have to have consumed six beers in twenty-five minutes. According to Dr. Wimbish, based upon his professional experience and study, the former scenario was factually more likely than the latter.
Dr. Wimbish confirmed that two of the variables that determine the timing and the level of a blood alcohol concentration peak are the amount of alcohol consumed and the time of consumption. The rate of consumption also determines the time of elimination of alcohol in the blood system. Dr. Wimbish was asked a hypothetical question regarding Rodney's estimated blood alcohol level if he had consumed five to six beers within twenty-five minutes prior to the trip culminating in the accident. He acknowledged that, according to the results of a published, peer-reviewed 1985 study, the blood alcohol concentration would have been .09 grams percent at 8:00 p.m., and .11 grams percent at 9:50 p.m. (the same concentration actually recorded in the hospital sample), and .075 grams percent at 12:00 a.m. midnight. With an additional factual assumption that Rodney ate something between 6:00 and 6:30 p.m., with the same rate of beverage consumption assumed previously, the blood alcohol level at 8:00 p.m. would have been .04 grams percent, according to the study. Dr. Wimbish further acknowledged that one reliable study interprets epidemiologic evidence as suggesting that risks of motor vehicle crashes begin to increase at blood alcohol levels of .05 grams per cent.
However, Dr. Wimbish further noted that under the first hypothetical scenario, the blood alcohol level of .09 grams per cent at the time of the accident would have had substantial adverse effects on Rodney's ability to drive a vehicle. He noted that it is generally accepted on a nationwide basis that the average individual is intoxicated while operating a motor vehicle at a blood alcohol level of .08 grams per cent.[19]

Propriety of JNOV on the issue of the Liability of DOTD
In more than one prior reported case, our supreme court has made the following observations regarding the highway at issue:
The physical characteristics of Greenwell Springs Road are not unique; many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences and other objects. . . . [I]t would be physically and financially impossible to bring all of the state's roads up to modern standards. . . . For this reason, the failure of DOTD to reconstruct the state's highways to meet modern standards does not establish the existence of a hazardous defect.
Myers v. State Farm Mut. Auto. Ins., Co., 493 So.2d 1170, 1173 (La.1986); Holloway v. State, Dep't of Transp. and Dev., 555 So.2d 1341, 1345 (La.1990). See also Aucoin, 97-1967 at p. 7, 712 So.2d at 64.
In Myers, the supreme court addressed DOTD's liability following a 1977 lane-widening *116 project undertaken on Greenwell Springs Road to conform the roadway to the eleven-foot standard then applicable. Our supreme court determined that DOTD did not need to comply with all modern standards because such a task would be physically and financially impossible for DOTD. Thus, the Myers court determined that DOTD's failure to reconstruct the state's highways to meet modern standards did not establish the existence of a hazardous defect. Myers, 493 So.2d at 1172-1173.
The accident in Holloway occurred on Greenwell Springs Road in 1984. The plaintiff driver was driving a tractor-trailer, coming out of a curve at approximately 40 miles per hour, when he inadvertently allowed the vehicle's right front tire to leave the roadway. Although he claimed that he tried to regain the roadway, he was unable to do so, and the vehicle entered the adjacent ditch (which had an AASHTO conforming, recoverable slope) before striking trees located just beyond the ditch's backslope. The travel lanes were twelve feet wide with one to two-foot shoulders at the accident location. The first tree struck was thirteen feet from the roadway edge. The supreme court found that there was no drop-off from the roadway pavement to the shoulder, as contended by the driver, and that the physical evidence showed that he did not try to regain the roadway; the vehicle instead traveled straight into the ditch after leaving the roadway pavement. The supreme court reversed the trial court's judgment finding DOTD 40% at fault, finding that neither a drop-off nor the shoulder contributed to the accident, and that the driver was solely at fault. Holloway, 555 So.2d at 1345.
After twice absolving DOTD from liability for the conditions on Greenwell Springs Road, in Aucoin, the supreme court determined that DOTD had allowed a combination of more than one dangerous conditions to accumulate on Greenwell Springs Road (in the area of the accident) rendering its off roadway area unreasonably dangerous to the motoring public, and therefore, DOTD could not escape liability for the accident. In Aucoin, the plaintiff was traveling on Greenwell Springs Road and swerved to the right to avoid a dog which ran onto the highway. The automobile's right wheels left the roadway, encountering a drop-off from the pavement to the shoulder, which was only about one foot wide, and a non-recoverable slope of 1.43:1 into the adjacent ditch. After the automobile entered the ditch, it struck a tree growing on the ditch's backslope and located eight and a half feet from the edge of the roadway's fogline. Considering all of the relevant factors, DOTD's chief design engineer "was unable to name any roadway [in Louisiana] that was more dangerous than Greenwell Springs Road." Aucoin, 97-1967 at p. 5, 712 So.2d at 65. Furthermore, an expert in mechanical engineering testified that due to the narrowness of the shoulder, the plaintiff could have avoided the ditch only if she had begun her recovery maneuver before actually leaving the roadway. Thus, the trial court found that the accident site was unreasonably dangerous because of the combination of the drop-off shoulder, the non-recoverable slope, and the limited horizontal clearance. The supreme court affirmed the trial court's apportionment of fault of 85% to the plaintiff and 15% to DOTD. In doing so, it distinguished its earlier cases of Myers and Holloway, involving the same highway, while at the same time reaffirming those cases' holdings of no liability on DOTD's part under their facts. Aucoin, 97-1967 at pp. 3-4, 712 So.2d at 64-65. The supreme court specifically found that:

*117 DOTD was fully aware of the substandard condition of the section of Greenwell Springs Road where the accident occurred. While in 1986 the Myers court noted that the physical characteristics of the road were not unique, the facts in this case reveal that by 1990, DOTD could not name a more dangerous road given the combination of dangerous conditions.
. . . While the roadway in the present case was in good condition, the shoulders were substandard. Should a driver, such as Aucoin, inadvertently travel off the shoulder, the vehicle becomes trapped in a non-recoverable slope and does not have a clear recovery zone. Under these dangerous conditions, DOTD cannot escape liability by claiming that it has no duty to bring this highway up to current standards.
The combination of more than one dangerous condition was allowed to accumulate by DOTD, rendering this off roadway area unreasonably dangerous to the motoring public. Under these circumstances, DOTD does have a duty to maintain this off roadway area so it does not pose an unreasonably dangerous condition to the motoring public, notwithstanding that the roadway at issue is an old highway.
Aucoin, 97-1967 at pp. 7-8, 712 So.2d at 66-67.
Bearing in mind that the issue of DOTD's liability "depend[s] on the facts and circumstances of each case," Holloway, 555 So.2d at 1343, our review of the entire record in this case supports the conclusion that the factual circumstances of this case closely resembles the facts of Aucoin, along with the additional fact, discussed herein below, that the driver of the vehicle, who is not the plaintiff, may have been intoxicated at the time of the accident.
From the jury verdict form, we do not know on what basis the jury found that a defect existed which created an unreasonable risk of harm. The jury was simply asked: (1) "Do you find that Louisiana Highway 37 (Greenwell Springs Road), at the site of this accident, had a defect on March 19, 1994, which created an unreasonable risk of harm?;" and (2) "Do you find that the defect that created the unreasonable risk at the accident site was a cause in the accident involving Joshua Forbes?" The jury responded affirmatively to both of these questions, and then assigned 40% fault to DOTD.
Based on our review of the record, we find there was sufficient evidence to support a reasonable juror's determination that any one of the following, or any combination of the following, were defects in Greenwell Springs Road at the site of the accident which created an unreasonable risk of harm: (1) that DOTD failed to conduct reasonable and necessary maintenance on the shoulders and shoulder slope, and that this failure resulted in the loss of a safety feature designed for the highway; (2) DOTD failed to conduct maintenance on the right-of-way adjacent to the paved roadway in accordance with its own standards and those of AASHTO and that this failure resulted in a lack of an adequate clear recovery zone; and (3) if the 1975 project constituted a major reconstruction of the highway, then DOTD failed to comply with the mandatory then-existing design and safety standards. Even if the 1975 project was not a major reconstruction, DOTD's failure to comply with the then-existing design and safety standards was a relevant factor in the ultimate determination by the jury of whether the roadway was unreasonably dangerous. We further find there was sufficient evidence to support a reasonable juror's determination that any one of the above defects, or *118 any combination of the above defects, that created an unreasonable risk of harm was a cause of the accident involving Joshua. And, we find that the evidence in the record clearly and overwhelmingly supports the jury's verdict with regard to DOTD's liability.
Furthermore, we find that the facts and inferences in this case do not point so overwhelmingly in favor of the trial court's conclusion that reasonable persons could not have arrived at a contrary verdict. In determining whether JNOV was warranted, there were numerous factual issues which the trial court should have resolved in favor of the plaintiff, as the party opposed to the motion for JNOV, but failed to do so. Rather, it appears that the trial court substituted its own evaluations of the evidence for that of the jury.
For instance, the evidence simply does not support the trial court's conclusion in its reasons for judgment that no reasonable juror could reach any conclusion other than that Rodney's automobile was out of control long before it left the traveled portion of the roadway. In fact, the only witness to testify that the vehicle was out of control long before it left the roadway was DOTD's expert Mr. Robinette.[20] Mr. Robinette claimed that the vehicle rotated forty-two degrees, stopped rotating, slid sideways for more than one-hundred feet and then traveled off the roadway. However, Mr, Robinette's opinion was contradicted by the testimony of Dr. Griffith, the guest passengers in Rodney's vehicle (Keith and Joshua), Sherry Dickerson, (who observed the accident in her rearview mirror), and the investigating state trooper. The area of the highway on which Rodney's automobile was traveling, after negotiating the gentle curve, was straight and level. If the trial testimony of Keith and Joshua regarding the sensation of the automobile passing over a bump or pothole is accepted as true, then the automobile's left tires had to be positioned near the centerline of the highway and possibly extending into the northbound or opposite lane, where the relevant patched area was located. That circumstance would support the conclusion that Rodney may have been using the opposite lane for the purpose of "straightening out" the curves in the roadway, due to his speed. The physical evidence and testimony demonstrated that the automobile then traveled in a straight, undeviating path from the initial tire mark near the centerline to the shoulder to its point of impact with the trees. The investigating state trooper observed four tire marks traveling straight off the road; he never noted that the tire marks crossed, rotated, spun, or otherwise traveled in a manner that would indicate that the vehicle had rotated forty-two degrees and nearly traveled sideways before leaving the roadway as suggested by Mr. Robinette. Thus, the evidence did not so overwhelmingly support the trial court's conclusion that the vehicle was out of control long before it left the roadway.
Nor does the evidence support the trial court's conclusion that there was no evidence to suggest Rodney would have successfully traversed the shoulder. Dr. Griffith explained that the steep shoulder slope was one of the three most significant environmental contributing factors (i.e., those for which DOTD would be liable for) to the accident. Dr. Griffith explained that if the shoulder slope had been 3:1, then Rodney's vehicle would have been able to drive *119 across the slope horizontally although it would not have been able to recover and return to the travel lanes. Dr. Griffith then explained that the combination of the shoulder slope and ditch bottom then caused the vehicle to roll over onto its side before striking the tree in the right-of-way. Dr. Griffith explained that had the shoulder slope on Greenwell Springs Road been 3:1, even with a narrow shoulder, the shoulder could have been successfully traversed, thereby avoiding the non-recoverable roll-over situation in which Rodney found himself in. Thus, evidence demonstrated that the condition of the shoulder and the shoulder slope did prevent Rodney from regaining control of his automobile; and the trial court's conclusion that the condition of the shoulder and shoulder slope did not constitute a cause-in-fact of the accident is simply not supported by the evidence as a whole.
Likewise, we also find that the causative role of the breach of the duty on the part of DOTD relating to the trees struck overwhelming favors the plaintiff. As the trial court correctly noted in its reasons, the plaintiff bore the burden of proof as to the predicate fact of the location of the trees struck by the automobile within DOTD's right-of-way, as well as the causative role of its purported breach of its duty to remove the trees. In this regard, the plaintiff introduced objective, affirmative evidence upon which the jury could have found he established the existence of a 30-foot right-of-way from the centerline of the highway or to a fence, whichever was closer, at the accident location as early as 1927; he sufficiently refuted the existence of a closer fence line; and he established that the right-of-way encompassed the tree involved in the collision. Additionally, based on the opinion testimony of not only the plaintiff's experts, Mr. Clary and Dr. Griffith, but also that of Mr. Robinette, the trees' location was clearly shown to be causally significant in terms of the ultimate impact upon the automobile. Both Mr. Robinette and Dr. Griffith testified that the presence of the tree 10.52 feet from the edge of the roadway was a significant contributing factor to the collision and subsequent injuries of Joshua, and Mr. Robinette admitted that had the tree not been located so close to the edge of the roadway, then Joshua would not have been ejected on the roadway following the impact with the tree.
However, we must acknowledge that the plaintiff's hypothesis that Rodney's blood alcohol level hours after the accident was attributable to rapid ingestion of multiple alcoholic beverages immediately before commencing the unfortunate journey does not comport with common sense. Moreover, it is contradicted by the unreasonable manner in which Rodney operated his automobile within the short period of time between his departure from the parking lot and the occurrence of the fatal accident. Such conduct in and of itself is highly suggestive and corroborative of a state of alcoholic intoxication. However, Rodney's intoxication is not enough to prevent Joshua from recovering for DOTD's fault in this case. It is merely a factor which must be weighed against Rodney, albeit heavily, in the allocation of fault between Rodney and DOTD. See Petre, XXXX-XXXX at p. 12, 817 So.2d at 1114. "[T]he courts of this state have `not relied solely upon blood tests to close the door and [charge] the intoxicated driver with sole fault in an accident. Rather, they look to other credible testimony which determines the effect of alcohol upon the ability of the driver to operate the vehicle and the extent of the impairment.'" (Citations omitted). Id.
*120 After being presented with conflicting testimony concerning Rodney's consumption of alcohol before the accident and the opinion testimony of Dr. Wimbish concerning Rodney's possible blood alcohol content at the time of the accident (which was based solely on assumptions not supported by any direct evidence at trial), the jury was asked: "Do you find that Rodney Cockerham was negligent on March 19, 1994 with regards to this accident?" and "Do you find that the negligence of Rodney Cockerham was a cause in the accident involving Joshua Forbes?" The jury responded affirmatively to both of these questions, and then assigned 60% fault to Rodney. Thus, while the jury determined that Rodney was negligent with regard to the accident, it apparently concluded that his negligence, including his intoxicated condition, was not the sole cause of the accident. We must, therefore, conclude that weight assigned by the trial court to its determination that because Rodney "was impaired by alcohol, was very familiar with the roadway but was still driving excessively over the speed limit, and was showing off moments before the accident," he should be solely at fault for (and likewise, that DOTD should be absolved from fault) causing Joshua's injuries was clearly inappropriate.
Therefore, based upon our careful review of the extensive evidence in this case, we must conclude that reasonable minds could differ as to the respective liability of Rodney and DOTD. Moreover, we find that the jury's verdict on the liability of DOTD was reasonably supported by the evidence presented at trial. Such being the case, JNOV was clearly improper, and we hereby reverse the trial court's April 27, 2005 judgment in that respect.

Alternative Motion for New Trial
The plaintiff further contends on appeal that if this court determines that the JNOV was improper, then DOTD was also not entitled, in the alternative, to a new trial on the issue of its liability. We agree.
A party may join a motion for new trial with a motion for JNOV, or may pray for a new trial in the alternative. La. C.C.P. art. 1811(A)(2). If the court grants the JNOV, the court shall also rule on the motion for a new trial by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for new trial. La. C.C.P. art. 1811(C)(1).
Louisiana Code of Civil Procedure article 1972 provides:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) Where the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
Additionally, La. C.C.P. art.1973 provides: "A new trial may be granted in any case if there is good ground therefore, except as otherwise provided by law."
The judgment of the trial court signed on April 27, 2005 provided, in the alternative that "the law and evidence being in favor of DOTD," a new trial was granted. The trial court's written reasons for judgment reflect that the motion for new trial was granted on the basis that "this [c]ourt finds the jury's verdict clearly contrary to the law and evidence."
*121 A trial court may order a new trial if a jury's verdict cannot be supported by "any fair interpretation of the evidence." Martin v. Heritage Manor South Nursing Home, XXXX-XXXX, p. 5 (La.4/3/01), 784 So.2d 627, 631-632. As our supreme court explained in Davis, XXXX-XXXX at pp. 3-4, 774 So.2d at 93:
The fact that a determination on a motion for new trial involves judicial discretion . . . does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, a jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.
The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Martin, XXXX-XXXX at p. 6, 784 So.2d 632. In order to apply this standard, "we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial." Davis, XXXX-XXXX at p. 11, 774 So.2d at 93-94. "The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case." Id. at 94.
In this case, the trial court's written reasons for judgment in granting the new trial stated:
It should be obvious from this [c]ourt's opinion dealing with the JNOV that this [c]ourt finds the jury's verdict clearly contrary to the law and evidence. For the same reason this [c]ourt grants a JNOV, this [c]ourt would certainly grant a [n]ew [t]rial if it is later determined that this current ruling [(the granting of the JNOV)] is vacated or reversed.
Thus, the trial court's reason for finding the jury's verdict on DOTD's liability clearly contrary to the law and the evidence, was the same as its reason for finding that JNOV on the issue of its liability was warrantedi.e., that "no legitimate evidence . . . would have caused reasonable jurors to come to any other conclusion of fact."
In several recent cases, our supreme court, this court, and other courts of appeal have concluded that when a JNOV is reversed based on the determination that the jury's verdict was reasonably supported by the evidence presented at trial, the alternative request for a new trial should also be denied (or reversed on appeal). See Trunk v. Medical Center of Louisiana at New Orleans, XXXX-XXXX, p. 11 (La.10/19/04), 885 So.2d 534, 540 ("Because we have previously concluded [in reversing the JNOV] that the jury's verdict was reasonable in light of the evidence presented, we find that plaintiff is not entitled to a new trial"); Davis v. Witt, XXXX-XXXX, p. 23 (La.7/2/03), 851 So.2d 1119, 1134 ("When any fair interpretation of the evidence supports the jury's verdict, the grant of a new trial must be reversed"); VaSalle v. Wal-Mart Stores Inc., XXXX-XXXX, p. 18 (La.11/28/01), 801 So.2d 331, 342 ("Because we have previously concluded [in reversing the JNOV] that the jury's verdict [was] reasonable in *122 light of the evidence presented, we find that plaintiffs are not entitled to a new trial"); Yohn v. Brandon, XXXX-XXXX, pp. 11-12 (La.App. 1st Cir.9/27/02), 835 So.2d 580, 587, writ denied, 2002-2592 (La.12/13/02), 831 So.2d 989 ("As . . . we have concluded [in reversing the JNOV] that the jury's verdict was reasonable in light of the evidence presented . . . the plaintiff was not entitled to a new trial." (Quotations and citations omitted)); In Re Gramercy Plant Explosion at Kaiser, XXXX-XXXX, p. 17 (La.App. 5th Cir.3/28/06), 927 So.2d 492, 502, writ denied, XXXX-XXXX (La.6/14/06), 929 So.2d 1271 ("[W]hen a JNOV is reversed on determination that the jury's verdict was reasonable in light of the evidence presented, the conditional new trial should also be reversed"). Such a result comports with the concept of judicial economy and the interest of the parties in having longstanding lawsuits concluded. See Trunk, XXXX-XXXX at pp. 10-11, 885 So.2d at 540; and VaSalle, XXXX-XXXX at p. 18, 801 So.2d at 342.
We find such reasoning applicable to this longstanding case. In reversing the trial court's grant of JNOV, we determined that the evidence in the record supported the jury's verdict regarding DOTD's liability and that it was reasonable. Thus, the jury's verdict "was supportable by any fair interpretation of the evidence." See Davis, XXXX-XXXX at p. 10, 774 So.2d at 93. Therefore, DOTD was not entitled, in the alternative, to a new trial on the issue of its liability on the basis that the jury's verdict was contrary to the law. And our review of this record discloses no other groundsperemptory or discretionaryupon which a motion for new trial could have been granted. See La. C.C.P. art.1972 and 1973. "A conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur." Joseph v. Broussard Rice Mill, Inc., XXXX-XXXX, p. 15 (La.10/30/00), 772 So.2d 94, 105. Accordingly, we find the trial court abused its discretion in granting DOTD's alternative motion for a new trial, and we hereby reverse the trial court's April 27, 2005 judgment in that respect.
For all of the above and foregoing reasons, the April 25, 2005 judgment of the trial court granting the JNOV in favor of DOTD and absolving it from liability for the accident in this case, and alternatively granting a new trial on the issue of DOTD's liability is hereby reversed.

SUDDEN EMERGENCY DOCTRINE
National Union also contends on appeal that the trial court erred in instructing the jury regarding the "sudden emergency doctrine" because there was no basis for such an instruction under the facts adduced at trial.
The trial court's instruction with regard to this issue was as follows:
Now, sometimes a person finds himself in an emergency not of his own making. This does not really change the standard of care to which we hold such a person, but it does mean that you must take into account the circumstances of a sudden emergency. If the defendant was in a position of imminent peril which he could not have anticipated, without sufficient time to consider the best way to avoid an approaching danger, he is not negligent if he fails to choose what subsequently upon calm reflection might appear to have been a better method of avoiding the danger.
In other words, one who finds himself in a position of imminent peril, without sufficient time to consider and weigh all of the circumstances or best means that may be adopted to avoid an impending danger is not guilty of negligence if he *123 fails to adopt what might subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.[21]
(Footnote added.)
The trial court gave this instruction to the jury at the request of the plaintiff (and over the objection of the defendant) because of evidence suggesting that just prior to the accident, Rodney may have seen a patched area on the roadway, mistaken it for a pothole, and swerved to miss it. The plaintiff contended that this evasive maneuver by Rodney fell within the sudden emergency doctrine, and therefore, Rodney could not be negligent in causing the accident.
National Union argues that the only evidence in this regard was the opinion of Dr. Griffith, which was not based on the testimony of the fact witnesses. Thus, National Union contends that the jury instruction regarding the "sudden emergency doctrine" erroneously allowed the jury to consider a "phantom pothole" as an excuse for Rodney's loss of control of his vehicle.
Although Rodney did testify that he had no recollection of trying to "dodge a pothole" on the date of the accident, he also testified that had no recollection of the events just prior to the accident until he woke up in the hospital. However, Keith, who was seated in the rear seat of Rodney's car when it left Fleniken's parking lot, testified that after Rodney's vehicle passed Wade's truck and began to decelerate, he thought the vehicle struck a pothole and went straight into the ditch adjacent to the southbound shoulder.
Additionally, Toby, the passenger in Wade's truck, testified that he observed the taillights of Rodney's automobile passing around the curve in the road ahead of the vehicle in which he was riding, and as Wade's truck came upon the curve, he noticed vehicle debris and Joshua lying in the roadway. Toby explained that once Wade realized a person was in the roadway, he swerved, however, the right (or passenger's) side of the truck struck or rolled over Joshua. After Wade stopped his truck, Toby testified that he exited the vehicle and encountered Keith, who told him that they "hit a pothole."
Joshua testified that he recalled Rodney's automobile going around the last curve before the accident location and passing over something that felt like a hole, which caused the automobile to "kind of jerk down" and then the automobile veered off the roadway.
Dr. Griffith expressed the opinion that the Rodney's vehicle traveled to the edge of the roadway after he attempted an evasive maneuver of some type, perhaps after having seen the patched potholes on the roadway, and swerved to miss what he perceived to be a hazard. Trooper Lanoux confirmed the existence of the patched areas in the roadway just north of the accident site, which Rodney would have encountered prior to the accident, as he was traveling south on the roadway.
In a jury trial, the trial court is obligated to give instructions which properly reflect the law applicable in light of the pleadings and facts in each case. Hymel v. HMO of Louisiana, Inc., XXXX-XXXX, pp. 13-14 (La.App. 1st Cir.11/15/06), 951 So.2d 187, 198, writ denied, 2006-2938 (La.2/16/07), 949 So.2d 425. Adequate jury *124 instructions are those instructions which fairly and reasonably point out the issues presented by the pleadings and evidence and which provide correct principles of law for the jury to apply to those issues. Id., XXXX-XXXX at p. 14, 951 So.2d at 198. Whether or not to include a requested jury instruction is a matter within the wide discretion of the trial court and will not be overturned on appeal absent an abuse of that discretion. Gardner v. Griffin, 97-0379, p. 4 (La.App. 1st Cir.4/8/98), 712 So.2d 583, 586. When assessing an alleged erroneous jury instruction, it is the duty of the reviewing court to evaluate such impropriety in light of the entire jury charge to determine if it adequately provides the correct principles of law as applied to the issues and whether they adequately guided the jury in its deliberation. Hymel, XXXX-XXXX at p. 14, 951 So.2d at 198. An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the jury instructions were so erroneous as to be prejudicial. Id.
The rationale for the sudden emergency doctrine is the principle that a person confronted with a sudden emergency, who does not have sufficient time to weigh and consider the best means to avoid an impending danger, should not be held to the same standard of control, care, and caution as someone who has ample opportunity to fully exercise judgment and reason. Whiddon v. Hutchinson, 94-2000 p. 6 (La.App. 1st Cir.2/23/96), 668 So.2d 1368, 1374, writs denied, 96-0731 and 96-0775 (La.5/10/96), 672 So.2d 923. In this case, the trial court's instruction on the sudden emergency doctrine merely pointed out the possibility that Rodney may have been faced with a sudden emergency, and if so, informed the jury that they should take that factor into account when evaluating Rodney's behavior. And the instruction given by the trial court also pointed out the possibility that the sudden emergency doctrine would not apply if the emergency with which Rodney faced was brought about by his own negligence. Given the evidence suggesting that Rodney's vehicle may have left the roadway because he was either attempting to miss or actually struck a patched area or a pothole in the roadway, we find the issue of whether Rodney encountered a sudden emergency was clearly an issue for the jury to resolve in this case.
Additionally, we note that the trial court's instruction with regard to the sudden emergency doctrine was not specifically directed at the conduct of Rodney, but rather, was included as part of its instructions with regard to the conduct of the defendants (other than DOTD) whose fault was at issue, i.e., Rodney and Wade. Notwithstanding the possibility that the sudden emergency doctrine may not have been applicable to Rodney (either because of his own negligence or insufficient evidence to establish that he was confronted with a sudden emergency), whether Wade was confronted with a sudden emergencywhen he rounded the curve and came upon Joshua lying in the roadwaywas also clearly an issue for the jury to resolve. Notably, the verdict form provided to the jury did not ask whether they found that Rodney (or any other defendant) encountered a "sudden emergency." Rather, the jury was simply asked whether the defendant Rodney was negligent and whether that negligence was a cause of the accident and whether the defendant Wade was negligent and whether that negligence was a cause of the accident. While the jury found that Rodney was negligent (and assigned 60% of the fault to him), it also found that Wade was not negligent (and therefore, assigned 0% fault to him). Thus, while the jury may not have found that Rodney encountered a sudden emergency *125 (because the instruction on sudden emergency told the jury that if he had encountered a sudden emergency, he could not be negligent) or that the sudden emergency was brought about by his own negligence, it arguably found that Wade did encounter such an emergency. Thus, the instruction on the sudden emergency doctrine was clearly proper.[22]
After reviewing the jury instructions as a whole, we find that they fairly and reasonably pointed out the issues presented by both the pleadings and the evidence, and accurately reflected the applicable law, and therefore we find no error in the trial court's decision to instruct the jury on the doctrine of sudden emergency.
This assignment of error is without merit.

ALLOCATION OF FAULT
In its third assignment of error, National Union contends that the jury erred in assigning less than 100% fault to Rodney. National Union argues that because Rodney was operating his vehicle in an unreasonable manner (i.e., exceeding the speed limit, was intoxicated, and failed to properly control his vehicle), DOTD should not bear any fault for this accident. Thus, its argument is essentially that DOTD should not be held liable for the accident because of the actions of Rodney. As previously noted, the fact that Rodney may have been negligent and intoxicated is insufficient to preclude Joshua from recovering for any fault attributable to DOTD. Rather, it is merely a factor to consider in Louisiana's comparative negligence scheme. See Petre, XXXX-XXXX at p. 12, 793 So.2d at 1113-1114. And because we have previously concluded (in reversing the JNOV and the alternative motion for new trial on the issue of DOTD's liability) that the jury's findings on DOTD's liability were supported by the record, the sole issue for us to consider on this assignment of error is whether the jury erred in allocating 40% fault to DOTD and 60% fault to Rodney.
The allocation of comparative fault is a factual matter. See Clement v. Frey, 95-1119, 95-1163, p. 7 (La.1/16/96), 666 So.2d 607, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Id. Before an appellate court can reverse a fact-finders determinations, it must find from the record that a reasonable factual basis does not exist for the findings and that the record establishes that the findings are clearly wrong or manifestly erroneous. Stobart v. State, DOTD, 617 So.2d 880, 882 (La.1993); see Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This court's determination of whether the jury was clearly wrong in its allocation of fault is guided by the factors set forth by our supreme court in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d *126 967, 974 (La.1985). In Watson, our supreme court stated:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
After reviewing the entire record and applying these factors to the comparative conduct of Rodney and DOTD, we cannot say that the jury's apportionment of 60% fault to Rodney and 40% fault to DOTD was clearly wrong and contrary to the evidence.
With regard to the first factor, a trier of fact could conclude that Rodney's conduct in leaving the roadway was either through inadvertence or as a result of his reaction to the patched area in the roadway. Dr. Griffith opined that Rodney's vehicle left the roadway due to his evasive action to avoid a perceived pothole, while the testimony of Joshua and Keith, the passengers in Rodney's car and eyewitnesses to the events leading up to the accident, indicated that his vehicle struck a pothole or a patched area in the roadway.
However, as previously noted, the evidence concerning Rodney's behavior shortly before the accident and the speed of his vehicle also supports the inference that Rodney was intoxicated at the time of the accident. As the driver of his automobile, Rodney was charged with the duty of maintaining proper control over it and to operate it in a prudent and responsible manner, and he failed to do so. Rodney was very familiar with Greenwell Springs Road in the area of the accident and was, no doubt, aware of the risk and danger to others and himself with regard to the manner in which chose to operate his vehicle. Therefore, his behavior in operating his vehicle in an unreasonable manner and while intoxicated was conduct involving an awareness of the danger.
However, DOTD certainly had a special awareness of the unreasonably dangerous conditions on Greenwell Springs Road. Mr. Savoie testified that the roadway and shoulders constructed during the 1975 project on Greenwell Springs Road did not meet the 1973 design standards in terms of lane width, shoulder width, shoulder slope, and horizontal clearance.[23] Mr. Nelson admitted that Greenwell Springs Road was a narrow road and that DOTD's maintenance of the shoulder was limited *127 to mowing it and filling in washouts of materials. Mr. White testified that in his opinion, Greenwell Springs Road was a "dangerous highway" due to its traffic volume, motorists' excessive speed, and low lighting conditions at night. Louisiana State Senior Trooper James Bentley testified that he was familiar with numerous incidents involving Greenwell Springs Road where vehicles traveled off of the roadway, into the ditch, and struck trees, and described those incidents as "quite common."
Notably, the substandard physical characteristics of Greenwell Springs Road (i.e., its substandard shoulders, its non-traversable shoulders, and its limited recovery zones) have been litigated in our courts for years and have been discussed at length by our supreme court in at least three casesMyers, Holloway, and Aucoin. We further note that by March 1994, DOTD was particularly aware of the risks to motorists and their passengers posed by the dangerous conditions on Greenwell Springs Road. While in 1986 our supreme court originally determined (in Myers) that those characteristics were not unique to Greenwell Springs Road, "by 1990, DOTD could not name a more dangerous road [than Greenwell Springs Road] given the combination of dangerous conditions" that DOTD had allowed to accumulate. Aucoin, 97-1967 at pp. 7-8, 712 So.2d at 66.
Based on this evidence, we find that a reasonable juror could conclude that DOTD bore significant responsibility, albeit less than Rodney, for the accident under the first factor.
The same conclusion can be derived from an analysis of the second Watson factorthe degree of risk created by the actions of each actor. While Rodney's behavior certainly created an unacceptable risk, so did DOTD's failure to remedy a hazardous situation of which it was well aware.
In our opinion, the Watson factor addressing the significance of what was being sought by each actor, probably balances more in favor of DOTD than Rodney. Rodney placed Angela, his fiancee; Joshua, a minor who had been entrusted to his care; Keith, his cousin; and himself in danger for the sole purpose of going to a friend's house for a barbeque, an event that could have been postponed or for which a more prudent and responsible driver could have been obtained. Nonetheless, DOTD had years to repair several defects in its highway, but failed to do so.
As for the capacities of the actors, we find that a reasonable juror could conclude that DOTD was in a superior position to ameliorate the risks posed by the shoulder slope and right-of-way on this portion of Greenwell Springs Road had DOTD simply maintained its shoulders and right-of-way in accordance with its own guidelines and those of AASHTO. However, we also note that Rodney's own actions could have prevented this accident had he not been exceeding the speed limit, had he not been under the influence of alcohol, or had he ensured that his passengers secured their seatbelts. But, these issues only address part of the accident-causation issue. In determining that DOTD was also at fault in causing Joshua's injuries, the jury apparently concluded that once Rodney's vehicle left the paved surface of the roadway, the unreasonable manner in which he was operating his vehicle and his intoxicated condition played a less significant part in the remainder of the accident than the condition of the shoulder slope and the right-of-way. Therefore, if the fault of the parties in causing the harm to Joshua, as suggested in Campbell, 94-1052 at pp. 7-8, 648 So.2d at 902, is analyzed, a reasonable juror could certainly conclude that under *128 this Watson factor, a significant degree of fault lies with DOTD. Although Rodney's negligence may have initially set this accident in motion, he had no control over the resulting harm to Joshua caused by the impact of the vehicle with the tree in DOTD's right-of-way. Both Dr. Griffith and Mr. Robinette testified that had the first tree struck by Rodney's car been located at least thirty feet from centerline of the roadway (and beyond DOTD's right-of-way), then Joshua would likely not have been ejected onto the roadway following the car's impact with the tree. And, if Joshua had not been lying in the roadway, he would not have been struck by Wade's oncoming truck and his injuries would have been significantly reduced. In other words, Rodney's negligence may have set the course for an accident to happen, but the severity of the injuries to Joshua was a direct result of the impact of the car with the tree located within DOTD's right-of-way. Thus, a reasonable juror could conclude that DOTD's fault was substantial in causing the harm sustained by Joshua.
Lastly, there is no evidence in this record to suggest that either actor was subjected to any extenuating circumstance that might have required proceeding without proper thought and in haste. As previously noted, Rodney was not on a required mission or one that could not have been put off to another day. Again, though, DOTD had years to remedy the defect.
Rodney's irresponsible behavior unquestionably was a significant cause of both the accident and Joshua's injuries. As such, there is no doubt that he should bear significant responsibility for this accidentresponsibility which the jury recognized in assigning 60% fault to him. But Rodney's behavior alone would not likely have resulted in such a tragic accident had DOTD properly maintained its right-of-way by ensuring that trees located within such right-of-way were removed or had the shoulder slope of Greenwell Springs Road been properly maintained.
Given all of the evidence, the jury concluded that DOTD was 40% at fault in causing Joshua's injuries.[24] While we might well have reached a different conclusion on the apportionment of fault, we cannot find any manifest error in the jury's allocation of fault.
This assignment of error is likewise without merit.

DAMAGES
In its last assignment of error, National Union contends that the jury abused its discretion in its award of general damages in the amount of $10,800,000.00 to Joshua.[25] Specifically, the jury awarded Joshua the following general damages: *129 

 Past, Present, and Future Physical
 Pain and Suffering $4,040,000.00
 Past, Present, and Future Mental Pain
 and Suffering $3,000,000.00
 Disfigurement and Physical Disability $2,160,000.00
 Loss of Enjoyment of Life $1,600,000.00

Vast discretion is accorded the trier of fact in fixing general damage awards. La. C.C. art. 2324.1. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn, 623 So.2d at 1261. Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id. As our supreme court explained in Youn,
Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id.
Therefore, the initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its vast discretion in assessing the amount of damages for the particular injuries and their effects under the particular circumstances on the particular injured person. Youn, 623 So.2d at 1260; Reck v. Stevens, 373 So.2d 498, 500-501 (La.1979). Only after a determination that the trier of fact has abused its much discretion is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn, 623 So.2d at 1260; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
National Union argues that although this court has a duty to review the award under an abuse of discretion standard, a review of recent cases involving serious injuries, such as Wingfield and Snearl v. Mercer, 99-1738 (La.App. 1st Cir.2/16/01), 780 So.2d 563, writs denied, XXXX-XXXX and XXXX-XXXX (La.6/22/01), 794 So.2d 800 and 794 So.2d 801, demonstrates that the jury far exceeded any measure or reasonableness because its award exceeded the "highest of the high" awards made to claimants who were more seriously injured than Joshua. National Union reasons that since Joshua was "able to walk in front of the jury," "has adapted to the use of his right arm," "is now married" with a young child, and "might one day return to work in competitive employment" (provided his psychological problems have been addressed and he receives vocational counseling), his injuries were not as severe and debilitating as those in Wingfield and Snearl. Therefore, National Union contends that the jury's award of general damages was excessive and should be reduced to $1,000,000.00, the highest reasonable general damage award under the facts of this case.
However, as previously noted, our initial determination is not guided by prior awards; rather, our initial inquiry is whether the award to Joshua was beyond that which a reasonable trier of fact could *130 assess for the effects of the particular injuries to him under the particular circumstances of this case. Although Joshua may have, ten years post-accident, been able to walk in front of the jury, adapted to the use of his right arm, and gotten married, and one day, may be able to work, the jury was also presented with evidence amply demonstrating the mental, physical, and emotional impact that Joshua's injuries have had on him.
Prior to the accident, Joshua was an active nine-year-old boy, who lived in Pride, Louisiana, and attended Northeast Elementary. He was performing well academically in class, had many friends, and his favorite subject was "P.E." Joshua also participated in sports activities, such as football and baseball. He wanted to attend Tulane University, and he wanted to be a professional football player or a professional wrestler. However, as a result of the accident, his whole life was changed.
Although Joshua's memory of the events that occurred after Rodney's vehicle left the parking lot of Fleniken's was fragmentary, he recalled the automobile going around the last curve before the accident location, passing over something that felt like a hole, and veering off the roadway. He then recalled that he was lying in the road, had touched his chin with his hand, and noticed blood on that hand. A few seconds later, he looked up and saw headlights. His next memory was waking up in the hospital two months later.
The first witness to arrive as the scene of the accident, Sherry Dickinson, testified that she observed Joshua lying in the roadway with his left arm amputated and a bone protruding from the area of his left knee. She further testified that Joshua was conscious the entire time and that he was screaming in pain.
Emergency personnel from the Baton Rouge Fire Department and the Pride Volunteer Fire Department were the first responders to the scene of the accident and immediately began to care for Joshua because his arm had been amputated and his lower legs were broken and deformed. All of the emergency personnel that responded to the accident testified that Joshua was fully conscious and screaming in pain from the time they arrived at the accident until they arrived at the hospital in the ambulance almost an hour later.
Thomas Wistrand, a paramedic with Emergency Medical Services, arrived at the accident after the fire department personnel, attended to Joshua's care both at the scene of the accident and in the ambulance. He testified that in the ambulance Joshua "was screaming like a wounded animal who was about to die," his left arm was gone, and his upper leg bones could be seen protruding from his skin. Mr. Wistrand further testified that after responding to this accident and witnessing the injuries sustained by Joshua that he, a paramedic of twenty-one years, had to obtain crisis counseling.
After arriving at the emergency room of Our Lady of the Lake Hospital in Baton Rouge (approximately a thirty-five minute drive from the scene of the accident), Joshua underwent nine surgical procedures over a period of thirteen to fourteen hours, which were performed simultaneously by Dr. John Dean, a plastic surgeon, and Dr. Charles Walker, an orthopedic surgeon.
Dr. Dean replanted Joshua's left arm, a procedure which involved cleaning the arm, shortening the bone, stabilizing it with a plate and screws, and reconnecting his blood vessels, nerves, tendons, muscles, and skin. Dr. Dean described the actual amputation of Joshua's arm as having "looked almost like he had his arm in a guillotine" because it was "relatively a *131 sharp cut right through the bone, right through the tendons and muscles, nerves and arteries." Additionally, Dr. Dean repaired and closed lacerations to Joshua's chin, face, neck, and wrist.
With regard to Joshua's legs, Dr. Walker testified that Joshua sustained three separate fractures to his legs. The first was to his right thigh bone (femur), and was considered an open, third degree fracture (the worst type of fracture with the highest risk for complications and infection) because the bone was protruding from the skin approximately 3-4 inches. This fracture extended into and destroyed part of Joshua's growth plate located above his knee. Dr. Walker explained that since children have 3/8 inch growth per year in that particular growth plate and considering the fact that at the time of the accident Joshua had at least 6-7 more years of growth, Dr. Walker expressed his concern that this particular fracture would cause a significant leg-length discrepancy in Joshua's upper legs as he got older. Additionally, due to the location of this fracture, Dr. Walker testified that it was necessary to use an "external fixator" on Joshua's leg (a metal plate with small holes that is placed on top of the leg and 6 to 8 inch metal screws are then inserted through the skin, muscle, and the bone) to stabilize the fractured bone and keep it from "popping" back through the skin. Dr. Walker testified that this fixator remained on Joshua's leg for approximately two months, after which it was surgically removed and replaced with a cylindrical cast on his entire leg.
The second fracture Joshua sustained was to his left shin bone (tibia). Dr. Walker testified that this fracture was also an open third degree fracture and that his front shin bones were sticking out of his skin a couple of inches and in different directions. Dr. Walker further testified that this fracture also went across the growth plate located below the knee and into the knee joint, and that the use of an external fixator was also necessitated by the location of this fracture. Dr. Walker further expressed his concern that this fracture would also cause problems for Joshua in the future again because of the growth plate and because the fractured bone was a weight bearing bone.
The third fracture Joshua sustained was to his left thigh. Dr. Walker testified that although this was not an exposed fracture, the nature of the fracture to Joshua's shin bone required him to repair the fracture by making a large incision in his thigh and then physically tearing the thigh muscles away from the bone in order to clamp a metal plate to the bone. Dr. Walker also testified that, although Joshua's right ankle was fractured on both sides, he was unable to surgically treat the fractures because Joshua had to be removed from anesthesia for safety reasons. Therefore, he placed a plaster splint on the ankle. Additionally, in Joshua's right foot, he sustained nerve damage resulting in a peroneal foot drop or nerve palsy.
Several hours after the surgical procedures by Drs. Dean and Walker, Joshua underwent another surgical procedure by Dr. Richard Byrd in order to repair internal injuries to Joshua's stomach and pancreas that were sustained in the accident.
Additionally, as a result of damage to Joshua's muscles, from both the accident itself and the surgical procedures, muscle proteins were "dumped" into Joshua's bloodstream. This caused Joshua's kidneys to "clog" (myoglobulinuria), and he went into acute renal failure. He also developed pulmonary edema and other respiratory problems. Since Baton Rouge did not have a pediatric nephrologist, Joshua was transferred (just four days after the accident) by ambulance to Tulane University *132 Medical Center in New Orleans for hemodialysis and further care in the pediatric intensive care unit. During this hospitalization, Joshua's treatment required that he be fed through a feeding tube, which passed through his nose and into his stomach.
Over the next several months, while hospitalized at Tulane, Joshua underwent approximately thirteen surgical procedures, including a muscle flap procedure on his arm to allow for the closure of exposed nerves and vessels, vein grafts, and skin grafts of both thighs and his abdomen. Joshua's medical care also included the debridement of his various wounds to treat continuing wound infections, a revision of internal scar from the removal of part of his pancreas (because the scarring was impinging on and blocking his stomach and bowels), carpal tunnel and ulnar tunnel release surgeries to relieve swelling in his left hand, the removal of the bilateral external fixation devices from his legs, the removal of his ankle cast, and the application of cylinder casts on both legs. Joshua was eventually released from the hospital and returned home.
Joshua testified that although his arm had been reattached, it looked like a "dead little arm," he was unable to use it and felt like his "whole arm was on fire." Additionally, Joshua testified that he began having problems academically in school; he failed a couple of grades but was socially promoted. He testified that his football and baseball teammates no longer wanted to play with him and that his classmates began making fun of him and calling him names, such as "cripple," "gimp," and "tyrannosaurus rex arm." Joshua testified that he eventually stopped going to public places because he did not like the way people stared at him. The combination of academic difficulties, the aversive social environment, and his increasing self-consciousness about how different he became led Joshua to dropping out of school in the ninth grade.
Eventually, as a result of the fracture to Joshua's right femur and growth plate, his legs starting to grow at a twenty degree angle and he essentially became a "knock knee." In August 1999, Dr. James Toliver Bennett, a pediatric orthopedic surgeon, performed surgery to correct this deformity essentially by cutting the bone with a saw, removing a wedge of bone, and realigning the bones so they would be straight.
As a result of the nerve damage in Joshua's right foot, he developed right foot equinovarus deformity; and therefore, in January 2000, Dr. Bennett performed a triple arthrodesis (where the bones in the feet are "chiseled down to the bloody bone" and "fused together" to become a block of bones) and a heel cord lengthening surgery was performed so that his foot could be repositioned in the proper direction. Dr. Bennett explained that despite the surgery, his foot would still not be normal and would very likely cause Joshua to have problems, such as arthritis in the joints surrounding the fusion. When Joshua became an adult, Dr. Bennett referred him to Dr. Raoul Rodrigues (for his lower extremity problems) and to Dr. Ollie Edmunds (for the problems associated with his arm).
According to Dr. Edmunds, by the first time he saw Joshua in May 2002, he had undergone thirty-one surgical procedures and that he has performed several procedures on Joshua since then. Dr. Edmunds opined that although the replanting of Joshua's left arm was a "technical success," it was a "functional failure" because he had severe nerve palsies, an inability to use his hand, stiff hand and fingers, numbness, and a floppy wrist. Dr. Edmunds explained that Joshua basically had a *133 "painful, numb, paralyzed, functionless live arm" and therefore, recommended a re-amputation of his left arm below the shoulder. On November 4, 2002, a left above elbow/below the shoulder arm amputation was performed on Joshua. According to Dr. Edmunds, Joshua developed serious and excruciating "phantom pain" problems, necessitating that Joshua be placed on anticonvulsants and pain medication. Dr. Edmunds explained that "phantom pains" are caused by nerve damage and are terribly painful. He described the sensation of phantom pains as feeling like ones fingers are curled up and cramped in painful positions, like ones hand is in a vise, like ants are crawling all over ones hand or arm, or like ones hand and arm has been placed in scalding water.
Dr. Edmunds testified that when Joshua was eventually able to "manage" his phantom pain problems (several months to a year later), they (Dr. Edmunds and his partner Dr. Rodrigues) began to address his lower extremity complaints of pain in the ankle and hip. And in 2003, Dr. Edmunds and Dr. Rodrigues performed several surgical procedures on Joshua, including a procedure to remove hardware to help his pain and stiffness in his ankle. Later, a total fusion of the bones in his right ankle was performed.[26] Additionally, as a result of the fractures to Joshua's legs, Joshua developed (as predicted by Dr. Walker) a leg length discrepancy and is in need of surgery to correct this problem.[27] Additionally, during the course of Dr. Edmunds' treatment of Joshua, he recommended that Joshua see a mental health professional because of his crying spells, depression, and panic attacks.
Dr. William Drew Gouvier, a clinical psychologist and neuropsychologist, diagnosed Joshua with post-traumatic stress disorder and agoraphobia with history of panic disorder. Dr. Gouvier noted that Joshua suffered from post-traumatic amnesia with regard to events that occurred during the two-month period after the accident, which Dr. Gouvier attributed, in part, to the problems Joshua had with regard to his kidneys and the resulting renal failure after the accident. Additionally, Dr. Gouvier testified that Joshua felt guilty about his injuries because of the financial strain his medical bills placed on his family. Dr. Gouvier also noted that Joshua was left-side dominant before the accident and after the accident, had to learn to become "right-handed." Dr. Gouvier recommended that Joshua's psychological problems be treated aggressively with psychotherapy and medication and that he eventually receives counseling directed toward goal planning and vocational rehabilitation services.
By the time of trial, more than ten years after the accident, Joshua testified that he still suffers from a number of physical problems and psychological problems. Joshua testified that he lives in constant pain. He testified that the scars on his body from skin grafts performed on him over the years are so tight, that he feels the skin may tear apart at any moment, and if something bumps into him or touches those areas, it feels like the area is being "stabbed." He is currently having problems with pain in his knee, lower back, and hip because he walks with a limp. He further testified that he has frequent headaches, becomes anxious, and has panic attacks. He has trouble sleeping *134 at night and has frequent late night awakenings.
After considering all of the evidence in the record under the standards discussed above, we cannot say that a reasonable juror under the specific facts of this case, could not have awarded general damages at the generous level awarded by the jury in this case. Joshua was nine years old when he was involved in this traumatic accident and sustained gruesome injuries. By all accounts, he was conscious at the scene, where he lay on the highway screaming in pain, without an arm, unable to move, and waiting for help. Dr. Walker (the orthopedic surgeon who operated on Joshua's legs the night of the accident) testified that in his entire career (that began in 1983), he had "never [seen] the magnitude of injuries [that Joshua sustained] all together in the same patient that [actually] survived."
As a result of Joshua's extensive injuries, he has undergone more than thirty-one surgical procedures, numerous hospitalizations and other medical treatment. As of the time of trial (more than ten years after the accident), he continued to suffer from numerous physical and psychological problems. Thus, given the evidence in this record, we are unable to say that the jury abused its vast discretion in its award of general damages to Joshua.[28]
This assignment of error is likewise without merit.
As we have found no abuse of the trial court's discretion with regard to its jury instructions, no manifest error in the factual findings made by the jury with regard to liability or allocation of fault, or any abuse of the jury's vast discretion with regard its award of damages, the January 14, 2005 judgment rendered in accordance with the jury verdict is hereby reinstated.

CONCLUSION
For all of the above and foregoing reasons, the April 27, 2005 judgment of the trial court granting the motion for judgment notwithstanding the verdict, and alternatively, the motion for new trial filed by the State, through the Department of Transportation and Development is hereby reversed, and the January 14, 2005 judgment rendered in accordance the jury verdict is hereby reinstated.
All costs of this appeal in the amount of $12,760.47 are assessed equally to the defendant/appellee, the State of Louisiana, through the Department of Transportation and Development and the second appellant, National Union Fire Insurance Company of Pittsburgh, Pennsylvania.
JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED; ALTERNATE JUDGMENT GRANTING NEW TRIAL REVERSED; JUDGMENT RENDERED ON JURY VERDICT REINSTATED.
KUHN, J., concurs and assigns reasons.
HUGHES, J., concurs.
GAIDRY, J., concurs and dissents in part.
McCLENDON, J., concurs and dissents in part for reasons assigned by Judge GAIDRY.
KUHN, J., concurring.
In this case, the jury, as the trier of fact, weighed the conflicting evidence and *135 assigned 60% fault to Rodney Cockerham and 40% fault to the Louisiana Department of Transportation and Development. If this court had been the trier of fact, undoubtedly, the fault allocation would have been different. Appellate courts, however, cannot determine factual issues on a clean slate, but are constrained to give deference to the trier of fact. Clement v. Frey, 95-1119, 95-1163, p. 5 (La.1/16/96), 666 So.2d 607, 610. The allocation of fault amongst the defendants in this case is such a factual determination to which we must afford deference. Id. Because the evidence establishes that a reasonable factual basis exists for the jury's findings, they are not clearly wrong or manifestly erroneous. Stobart v. State through the Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993).
Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) controls our review of the general damages award. In Youn, the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn, 623 So.2d at 1260-61. The Court further stated that it is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1260-61. When reviewed under these standards, the general damage award, although high, does not constitute a clear abuse of the jury's great discretion.
GAIDRY, J., concurring in part and dissenting in part.
While I concur with the majority's ultimate disposition of the JNOV, as well as its ruling relating to Mr. Clary's acceptance as an expert witness, I am compelled to dissent as to its disposition of the alternate judgment granting a new trial. The majority in effect applies the same standard of review for both a JNOV and a judgment granting a new trial. In reversing the grant of the partial new trial, the majority gives only lip service to the trial court's discretion in granting a new trial, ruling that an alternate judgment granting a new trial should not be affirmed if a JNOV is reversed.
The standard of review of a judgment on a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. Magee v. Pittman, 98-1164, p. 19 (La.App. 1st Cir.5/12/00), 761 So.2d 731, 746, writ denied, 00-1694 (La.9/22/00), 768 So.2d 31, 602. The breadth of the trial court's discretion to order a new trial varies with the facts and circumstances of each case. Horton v. Mayeaux, 05-1704, p. 11 (La.5/30/06), 931 So.2d 338, 344. When a trial judge grants a new trial under La. C.C.P. art.1972's mandatory ground of a jury verdict being contrary to the law and the evidence, the appellate court must review the record in view of the specific law or evidence found to conflict with the jury verdict to determine whether the trial court abused its discretion in granting a new trial. Martin v. Heritage Manor South, 00-1023, p. 15 (La.4/3/01), 784 So.2d 627, 637.
The trial court's discretion in granting or denying a new trial on the mandatory grounds that the verdict is contrary to the evidence has been described as "great discretion," "much discretion," and "wide discretion." See, e.g., Martin, 00-1023 at p. 5, 784 So.2d at 632. However, it is not "virtually unlimited," as in the case of a new trial granted on discretionary grounds *136 under La. C.C.P. art. 1973. See Horton, 05-1704 at p. 10, 931 So.2d at 344. The question now facing this court has been aptly summarized as follows:
We are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case. [Citation omitted.]
We have very little guidance from the legislature as to whose province should prevail, the judge or the jury. Clearly there is no statutory or jurisprudential authority nor is there a blanket rule that either judge or jury should prevail over the other. . . . The decision must be made on a case by case basis,

Davis v. Wal-Mart Stores, Inc., 00-0445 p. 11 (La.11/28/00), 774 So.2d 84, 93-4. (Emphasis supplied.)
After ruling that JNOV was improper, the majority concludes that the judgment granting a new trial on the issue of liability was likewise improper as contrary to "the concept of judicial economy and the interest in the parties in having longstanding lawsuits concluded," citing as authority Trunk v. Med. Center of La at New Orleans, 04-0181, pp. 10-11 (La.10/19/04), 885 So.2d 534, 540.[1] But the cited holding in Trunk was expressly based upon the fact that the trial court in that case did not address the alternate motion for new trial when it granted the JNOV. Trunk, 04-0181 at p. 10, 885 So.2d at 540. In reversing the JNOV, the supreme court declined to remand the case on the grounds of judicial economy, and instead determined on its own that a new trial was not warranted. Here, however, the trial court in its judgment properly addressed both the motion for JNOV and the alternate motion for new trial, as required by La. C.C.P. art. 1811(C)(1).
The holding in Trunk, upon which the majority relies, is not a general rule of review for all JNOVs and alternate judgments granting new trials under La. C.C.P. art. 1811(C)(1). If it were, then it would plainly be pointless for a party to seek a new trial as an alternative to a JNOV, as the denial of a JNOV would seemingly always preclude the alternate grant of a new trial. This is not the law. Even when a JNOV is denied the trial court can still grant a motion for new trial. Gibson v. Bossier City General Hospital, 594 So.2d 1332, 1336 (La.App. 2nd Cir. 1991). This is so because a simple preponderance of the evidence is not sufficient to grant a JNOV. See Davis, 00-0445 at p. 4, 774 So.2d at 89. But if the jury's verdict in a civil action is contrary to the preponderance of the evidence, it is "clearly contrary to the law and the evidence," and a new trial "shall be granted." La. C.C.P. art. 1972.
A motion for new trial requires a less stringent test than that for a motion for JNOV, as its determination involves only the issue of a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Law v. State ex rel. Dep't of Transp. and *137 Dev., 03-1925, p. 7 (La.App. 1st Cir.11/17/04), 909 So.2d 1000, 1006, writs denied, 04-3154 (La.4/29/05), 901 So.2d 1062, and 04-3224 (La.4/29/05), 901 So.2d 1062. Whether to grant a new trial requires a discretionary balancing of many factors. Id. In deciding whether to grant a new trial, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and it may evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. Joseph, 00-0628, at pp. 14-15, 772 So.2d at 104.
Because the trial court may properly make its own assessments of credibility in determining whether to grant a new trial, unlike the criteria used in determining a motion for JNOV, it seems only proper that a reviewing court must also accord some deference to the trial court's credibility determinations in that regard. To do otherwise, as the majority does here, would essentially render meaningless the trial court's codal authority and great discretion to grant a new trial. The trial court's opportunity to assess the credibility of witnesses at trial is at least equal to that of the trial jury, and its ability to do so has been expressly recognized by our supreme court as probably the trial court's most significant authority in exercising its discretion to grant or deny a new trial. See Davis, 00-0445 at p. 10, 774 So.2d at 93.
In assessing the trial court's exercise of its discretion in granting a new trial, a reviewing court should determine whether the trial court's judgment granting a new trial is reasonably and fairly supported by the preponderance of the evidence in the record, as opposed to being based upon its mere disagreement with the trial jury's verdict. Because of the exacting requirements for granting a JNOV, it is theoretically possible for a JNOV to have been improvidently granted, and yet the jury verdict may be manifestly erroneous. Joseph v. Broussard Rice Mill, Inc., 00-0628, p. 16 (La.10/30/00), 772 So.2d 94, 105. For that reason, a reviewing court may not simply conclude that an alternate judgment granting a new trial must also be reversed when a JNOV is reversed. The majority fails to recognize that "there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that the jury could not have reached its conclusion on any fair interpretation of the evidence." Gibson, 594 So.2d at 1336.[2]
Intoxicated, recklessly speeding motorists would not seem to fall within the defined class of "persons exercising ordinary care and reasonable prudence" to whom DOTD owes a duty regarding the condition of its highways.[3] Nevertheless, our supreme court has held that a finding of intoxication on the part of a driver alone *138 does not preclude a finding a fault on the part of DOTD for failure to maintain or upgrade a highway shoulder or ditch foreslope. Petre v. State ex. rel Dep't of Transp. and Dev., 01-0876, p. 12 (La.4/3/02), 817 So.2d 1107, 1114. Still, a driver's "unacceptable and illegal actions in driving while intoxicated" should be "weighed heavily against [him]" as "a factor to consider in Louisiana's comparative negligence scheme." Id.
Reviewing the entire record and applying the Watson factors to the comparative conduct of Mr. Cockerham and DOTD, I must agree with the trial court's considered determination in granting the partial new trial that the jury's apportionment of only 60% fault to Rodney Cockerham and as much as 40% fault to the DOTD was clearly wrong and contrary to the evidence. Bearing in mind that the circumstances of each case are controlling, my review of the entire record compels the conclusion that the factual circumstances of this case more closely resemble those of Holloway v. State, Dep't of Transp. and Dev., 555 So.2d 1341 (La.1990), Netecke v. State ex. rel. DOTD, 98-1182, 98-1197 (La.10/19/99), 747 So.2d 489, and Cormier v. Comeaux, 98-2378 (La.7/7/99), 748 So.2d 1123, than those of Aucoin and Petre.
The record shows that an inordinate portion of the expert testimony at trial was devoted to exhaustive attempts to dissect the technical meaning of a "`Category B' reconstruction" relative to the meaning of a "major reconstruction" of a highway. A reviewing court should afford considerable weight to an administrative agency's construction and interpretation of its rules and regulations adopted under a statutory scheme that the agency is entrusted to administer, and its construction and interpretation should control unless they are found to be arbitrary, capricious, or manifestly contrary to its rules and regulations. In The Matter of Recovery I, Inc., 93-0441 (La.App. 1st Cir.4/8/94), 635 So.2d 690, 696, writ denied, 94-1232 (La.7/1/94), 639 So.2d 1169. DOTD's administrative interpretation of the character of the 1973 project as an overlay, rather than a major reconstruction, is supported by a clear preponderance of the evidence and is not arbitrary, capricious, or manifestly contrary to its rules and regulations or the contents of its manuals. The conclusion that the definition of a "`Category B' reconstruction" ("Reconstruct Base and Surfacing") in the Highway Plan Preparation Manual is equivalent to a "major reconstruction," for purposes of imposition of the duty to incorporate current safety standards, is simply not supported by a fair and reasonable interpretation of the evidence.[4]
The record contains no objective or competent subjective evidence that Rodney Cockerham's vehicle left the roadway due to either his evasive action to avoid a perceived pothole or the vehicle's striking an actual pothole or other true roadway *139 defect. As a driver, Mr. Cockerham was charged with the duty of maintaining proper control over his automobile and to operate it in a prudent and responsible manner. Dr. Griffith, the plaintiff's expert, unequivocally conceded during the plaintiffs case in rebuttal that for Rodney Cockerham, the automobile was "probably out of control" at the point near the center line where the first skid mark appeared. Mr. Robinette, DOTD's accident reconstruction expert, used that location as the point of loss of control for purposes of his calculations, but explained that the actual loss of control probably commenced prior to the point when the automobile reached that location. Mr. Cockerham's failure to maintain control of his automobile and to keep it on the roadway cannot be attributed to mere "inadvertence"; it was the inevitable product of reckless, gross negligence. Rodney Cockerham clearly breached important duties owed to Joshua, both in terms of the duties of a driver to his passenger and those of an adult to a minor relative under his supervision. For example, if Joshua had been properly seatbelted, the chances of his being violently ejected from the automobile, thrown back onto the southbound lane, and then struck by an oncoming pickup truck would have been significantly reduced, if not eliminated.
The overwhelming preponderance of the evidence supports the trial court's conclusion in its reasons that Rodney Cockerham's automobile was out of control long before it left the traveled portion of the roadway. Thus, the condition of the shoulder and the shoulder slope did not prevent Rodney Cockerham from regaining control of his automobile; it was already out of control and there was no evidence that he in fact attempted to and was prevented from regaining control by any condition of the shoulder or shoulder slope. The trial court's finding that the condition of the shoulder and shoulder slope did not constitute a cause-in-fact of the accident is amply supported by the evidence as a whole.
Mr. Cockerham's rash and irresponsible behavior unquestionably was the predominant, if not the sole, cause of both the accident and Joshua's injuries. His criminal negligence resulted in the death of one young person and the maiming and permanent disability of another, a minor relative entrusted to his care. In short, no fair interpretation of the evidence as a whole supports the jury's apportionment of fault. The fact that the trial court in its JNOV determined that Rodney Cockerham was 100% at fault, and that we reverse the JNOV based upon the particular strict standard governing its review, does not interdict the trial court's reasonable exercise of discretion in conditionally granting a new trial on the issue of liability. Unlike the JNOV, the judgment granting a partial new trial did not substitute an allocation of fault for that of a jury; it restored the status quo of the parties on the issue of liability for a new determination by a jury. Here, given the facts, the trial court unquestionably had the right to exercise its discretion to do so, and did not abuse that discretion.
In summary, I would reverse the trial court's JNOV, but affirm its judgment granting a partial new trial on the issue of liability and remand this matter for further proceedings. Because the trial court's judgment granting a partial new trial did not modify the jury's verdict as to damages, the original judgment would be final on that issue, but the final judgment on the merits would be held in abeyance pending the conclusion of the new trial, reserving the rights of the parties to appeal all issues after the new trial. See La. C.C.P. art.1971 and Thurman v. Star Electric Supply, Inc., 283 So.2d 212, 217 (La. *140 1973). For these reasons, I respectfully dissent in part from the majority's decision.
NOTES
[1] Rodney subsequently pleaded guilty to negligent homicide charges relating to the death of Angela.
[2] Wade and the two occupants of his automobile, Shane Blankenship and Toby Scott, were with Rodney in the parking lot of Fleniken's grocery store just prior to the accident. Wade and Rodney left the parking lot at approximately the same time.
[3] Belinda Forbes and George Forbes also asserted, individually, claims for loss of consortium for the injuries sustained by Joshua. However, during the trial of this matter, George Forbes and Belinda Forbes waived their claims for loss of consortium.
[4] The cases had originally been consolidated by order dated April 21, 1995, but that order was vacated on the grounds that the trial court had technically erred in assigning the consolidated cases to the wrong division under its local rules.
[5] American Medical Security, Inc., an intervenor in this matter, also perfected an appeal from this judgment; however, this court subsequently dismissed that appeal as abandoned.
[6] National Union also contended on appeal that the trial court erred in failing to properly instruct the jury in accordance with La. R.S. 9:2800, which requires a plaintiff to prove actual or constructive knowledge of a defective condition in a thing in order to recover damages from a public entity due to that defect. However, National Union subsequently withdrew this assignment of error after recognizing that this case was not governed by La. R.S. 9:2800 because the accident occurred prior to the effective date of the statute, as re-enacted in 1995. See Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14.
[7] DOTD also objected to Mr. Clary's testimony as an expert in the fields of highway design and highway maintenance. However, on appeal, National Union does not challenge his qualifications as an expert witness in those fields or in the field of civil engineering.
[8] Mr. Clary explained that although he retired in 2000, he was initially retained to evaluate the design, safety, and maintenance of Greenwell Springs Road at the area of the accident in this case in 1994.
[9] At the time this accident occurred, a plaintiff pursuing a strict liability claim was not required to show that the defendant had actual or constructive knowledge of the defect. See La. C.C. art. 2317 in effect on March 19, 1994. Thereafter, however, by 1995 La. Acts, No. 828, the Louisiana legislature re-enacted La. R.S. 9:2800 (after the 1985 version of the statute was declared unconstitutional), which requires a plaintiff to prove actual or constructive knowledge of a defective condition in a thing in order to recover damages from a public entity due to that defect. See Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14. Additionally, by 1996 La. Acts, 1st Ex.Sess., No. 1 § 1, the Louisiana legislature added La. C.C. art. 2317.1 to provide a knowledge requirement similar to that required in La. R.S. 9:2800 on the part of the owner of a defective thing.
[10] For convenience and consistency, we will refer to the various projects on the relevant portion of Greenwell Springs Road by the year of each project's acceptance after completion.
[11] However, we note that this portion of Aucoin was legislatively overruled by 1999 La. Acts, No. 1223, § 1. Thus, for cases arising after July 9, 1999, such evidence may not be admissible in a court proceeding.
[12] The barbed-wire fence was lying on the ground at the tree impact location, but Mr. Lanier was not able to determine when the fence was knocked down at that location. At other locations, it was attached to fence posts.
[13] Mr. Nelson and Mr. Wedge further explained that the size of the 1973 project plan sheets (8 1/2 inches by 11 inches) were typical of those for overlay projects, as compared to the standard size of plans for new construction or reconstruction (22 inches by 34 inches).
[14] He opined that the actual loss of control probably commenced prior to the point where the first tire tracks appeared.
[15] Mr. Robinette explained that once a motor vehicle spins and slides on its tires at an angle exceeding 15 degrees from its direction of travel, its driver cannot steer and recover control over the spin. The vehicle would thus be out of control and would continue to spin until it either stopped, struck something, or reached a very low speed.
[16] Under a hypothetical assumption of a completely flat, grassy shoulder with no tree line, using the automobile's actual speeds of about 75 miles per hour at the first tire mark and about 58 miles per hour when it left the roadway, the automobile would have traveled a total of 320 feet from the first tire mark to a stop. While doing so and leaving the roadway at a seven degree angle, it would have traveled slightly less than 40 feet laterally.
[17] Mr. Robinette explained that a pothole large enough to interfere with the steering path of a vehicle will cause visible damage to a tire rim or the suspension system. His inspection of Rodney's automobile revealed no such deformation or damage.
[18] Mr. Robinette also admitted that in a full braking maneuver, the front wheel brakes typically would lock-up before the rear wheel brakes and that the photographs depicting the tire marks attributed to the front tires did not show clear evidence of full front tire braking. However, he explained that the photograph showing the right rear tire mark confirmed that there was full braking on at least that tire, which would indicate at least partial braking on the others.
[19] See La. R.S. 14:98(A)(l)(b) (providing for the crime of operating a vehicle while intoxicated when the operators blood alcohol concentration is 0.08 grams per cent or more).
[20] We note that while Dr. Griffith testified that Rodney's vehicle may have been out of control at the first skid mark, his testimony in this regard was limited by his opinion that Rodney initially lost control of the vehicle after attempting an evasive maneuver to avoid hitting what he perceived to be a hazard in the roadway.
[21] See Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385, 389 (1972); Barbay v. Aetna Casualty & Surety Co., 454 So.2d 181 (La.App. 1st Cir.), writ denied, 457 So.2d 1181 (La.1984).
[22] Furthermore, even if the instruction was not appropriate, the proper inquiry in determining whether a jury verdict should be overturned on the basis of an erroneous jury instruction is whether the instruction was so erroneous as to be prejudicial. See Hymel, XXXX-XXXX at p. 14, 951 So.2d at 198. Or, in other words whether the jury was misled to such an extent that it was prevented from doing justice. Nicholas v. Allstate Ins. Co., 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023. In this case, although the jury was instructed on the sudden emergency doctrine, it found Rodney negligent and assessed a percentage of fault to him. So even if the inclusion of the instruction had been erroneous, the verdict was not affected.
[23] In determining whether a highway poses an unreasonable risk of harm (or is defective for strict liability purposes), a trier of fact may consider not only the standards in effect at the time of construction, but also, those in effect at the time of the accident. See Aucoin, 97-1967 at p. 7, 712 So.2d at 66 and Dill, 545 So.2d at 996 (while failure to adhere to AASHTO standards may not itself attach liability, whether DOTD has conformed to those standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous).
[24] In fact, our supreme court has upheld greater allocations of fault in cases involving drivers operating vehicles while more impaired than the evidence suggests that Rodney was at the time of the accident. See Toston v. Pardon, XXXX-XXXX (La.4/23/04), 874 So.2d 791 (allocating 80% fault to DOTD despite the fact that driver's blood alcohol at the time of the accident was between .215% and .293% and characterized as grossly intoxicated) and Petre (upholding an allocation of 50% fault to DOTD despite the fact that two hours post-accident, the driver had a blood alcohol level of .247%).
[25] General damages are those which may not be fixed with any degree of pecuniary exactitude but which instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification or intellectual or physical enjoyment, or other losses of life of lifestyle, which cannot really be measured definitively in terms of money. McGee v. A C and S, Inc., XXXX-XXXX, p. 4 (La.7/10/06), 933 So.2d 770, 774. On the other hand, special damages are those which have a ready market value, such that the amount may theoretically be determined with relative certainty, such as medical expenses and lost wages. Id. On appeal, National Union does not challenge the jury's special damage awards for past medical expenses in the amount of $450,288.00, future medical expenses in the amount of $1,100,100.00, past loss of earnings in the amount of $42,290.00, and future loss of earnings/earning capacity in the amount of $257,556.00.
[26] Joshua was not supposed to bear any weight on his foot for six to eight weeks post-surgery, which proved to be very difficult since he only had one arm.
[27] The cost of this surgery was included in the Joshua's award of future medical expenses.
[28] Although DOTD cites Wingfield and Snearl cases as illustrative of lower damage awards for injuries more severe than Joshua (although those cases involved injuries to adults rather than to a nine year old child), as we have determined that the jury did not abuse its discretion in its award of general damages to Joshua, it is inappropriate and unnecessary for us to undertake a comparison of the award in this case with past awards. See Youn, 623 So.2d at 1260.
[1] The age of the litigation was never mentioned as a relevant factor in Trunk. It is obvious that longevity of litigation alone should have no bearing upon the resolution of the merits of a dispute. The majority, however, seems to base its decision in part upon judicial expediency, rather than judicial economy. The "longstanding" nature of this case, which was not tried until over ten years after the accident, does not serve to mitigate the relevant facts.
[2] The majority's comparative analysis of the different standards for JNOV and new trial eviscerates the distinction between the two. The majority incorrectly equates a verdict based upon evidence "which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment" might differ upon it (evidence sufficient to raise a jury issue, or evidence creating a genuine issue of material fact) with a verdict "supportable by any fair interpretation of the evidence." See Martin, 00-1023 at pp. 4-7, 784 So.2d at 631-32. While the latter type of verdict is necessarily inclusive of the former, the converse is not true; a jury verdict may be based upon sufficient evidence to withstand a JNOV as a matter of law, yet still be clearly wrong for purposes of a new trial.
[3] Even "motorists who are slightly exceeding the speed limit or momentarily inattentive" do not fall within the category of "prudent and attentive drivers." See Netecke v. State ex rel. DOTD, 98-1182, 98-1197, p. 8 (La. 10/19/99), 747 So.2d 489, 495.
[4] The reconstruction of an existing roadway base, with a new surface or overlay, would not necessarily amount to a "major reconstruction" of a roadway. See, e.g., Hager v. State, ex rel. Dep't of Transp. & Dev., 06-1557, p. 9 (La.App. 1st Cir. 1/16/08), 978 So.2d 454, 462. This conclusion is supported not only by the wording of the "`Category B' reconstruction" definition itself, but also by the context in which the "General Construction Categories" were found: the last two pages of an appendix in the Highway Plan Preparation Manual, which was intended to regulate only the standards for the format and content of sets of plans, rather than to establish actual design, engineering, or construction standards. I would emphasize that throughout the exhaustive examination of witnesses regarding the DOTD manuals and the meaning of the term "reconstruction," plaintiffs counsel and Mr. Clary scrupulously avoided use of the determinative adjective "major" to characterize that term.